## MICHAEL H. ET AL. *v.* GERALD D.

APPEAL FROM THE COURT OF APPEAL OF CALIFORNIA,
SECOND APPELLATE DISTRICT

No. 87–746.   Argued October 11, 1988—Decided June 15, 1989

*Robert A. W. Boraks* argued the cause for appellants. With him on the briefs for appellant Michael H. were *George Kaufmann, Ronald K. Henry, Paul R. Taskier,* and *Joel S. Aaronson.* *Leslie Ellen Shear* filed briefs for appellant Victoria D.

*Larry M. Hoffman* argued the cause for appellee. With him on the brief was *Glen H. Schwartz.**

JUSTICE SCALIA announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE joins, and in all but footnote 6 of which JUSTICE O'CONNOR and JUSTICE KENNEDY join.

Under California law, a child born to a married woman living with her husband is presumed to be a child of the marriage. Cal. Evid. Code Ann. § 621 (West Supp. 1989). The presumption of legitimacy may be rebutted only by the husband or wife, and then only in limited circumstances. *Ibid.* The instant appeal presents the claim that this presumption infringes upon the due process rights of a man who wishes to establish his paternity of a child born to the wife of another man, and the claim that it infringes upon the constitutional right of the child to maintain a relationship with her natural father.

I

The facts of this case are, we must hope, extraordinary. On May 9, 1976, in Las Vegas, Nevada, Carole D., an international model, and Gerald D., a top executive in a French oil company, were married. The couple established a home in Playa del Rey, California, in which they resided as husband and wife when one or the other was not out of the country on business. In the summer of 1978, Carole became involved in an adulterous affair with a neighbor, Michael H. In September 1980, she conceived a child, Victoria D., who was born on May 11, 1981. Gerald was listed as father on the birth certificate and has always held Victoria out to the world as his

---

*Michael L. Oddenino* filed a brief for the National Council for Children's Rights as *amicus curiae* urging reversal.

*Paul Hoffman, Joan Howarth, John A. Powell, Helen Hershkoff, Steven R. Shapiro,* and *Isabelle Katz Pinzler* filed a brief for the American Civil Liberties Union Foundation et al. as *amici curiae.*

daughter.   Soon after delivery of the child, however, Carole informed Michael that she believed he might be the father.

In the first three years of her life, Victoria remained always with Carole, but found herself within a variety of quasi-family units.   In October 1981, Gerald moved to New York City to pursue his business interests, but Carole chose to remain in California.   At the end of that month, Carole and Michael had blood tests of themselves and Victoria, which showed a 98.07% probability that Michael was Victoria's father.   In January 1982, Carole visited Michael in St. Thomas, where his primary business interests were based. There Michael held Victoria out as his child.   In March, however, Carole left Michael and returned to California, where she took up residence with yet another man, Scott K.   Later that spring, and again in the summer, Carole and Victoria spent time with Gerald in New York City, as well as on vacation in Europe.   In the fall, they returned to Scott in California.

In November 1982, rebuffed in his attempts to visit Victoria, Michael filed a filiation action in California Superior Court to establish his paternity and right to visitation.   In March 1983, the court appointed an attorney and guardian ad litem to represent Victoria's interests.   Victoria then filed a cross-complaint asserting that if she had more than one psychological or *de facto* father, she was entitled to maintain her filial relationship, with all of the attendant rights, duties, and obligations, with both.   In May 1983, Carole filed a motion for summary judgment.   During this period, from March through July 1983, Carole was again living with Gerald in New York.   In August, however, she returned to California, became involved once again with Michael, and instructed her attorneys to remove the summary judgment motion from the calendar.

For the ensuing eight months, when Michael was not in St. Thomas he lived with Carole and Victoria in Carole's apartment in Los Angeles and held Victoria out as his daughter. In April 1984, Carole and Michael signed a stipulation that

Michael was Victoria's natural father. Carole left Michael the next month, however, and instructed her attorneys not to file the stipulation. In June 1984, Carole reconciled with Gerald and joined him in New York, where they now live with Victoria and two other children since born into the marriage.

In May 1984, Michael and Victoria, through her guardian ad litem, sought visitation rights for Michael *pendente lite*. To assist in determining whether visitation would be in Victoria's best interests, the Superior Court appointed a psychologist to evaluate Victoria, Gerald, Michael, and Carole. The psychologist recommended that Carole retain sole custody, but that Michael be allowed continued contact with Victoria pursuant to a restricted visitation schedule. The court concurred and ordered that Michael be provided with limited visitation privileges *pendente lite*.

On October 19, 1984, Gerald, who had intervened in the action, moved for summary judgment on the ground that under Cal. Evid. Code § 621 there were no triable issues of fact as to Victoria's paternity. This law provides that "the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." Cal. Evid. Code Ann. § 621(a) (West Supp. 1989). The presumption may be rebutted by blood tests, but only if a motion for such tests is made, within two years from the date of the child's birth, either by the husband or, if the natural father has filed an affidavit acknowledging paternity, by the wife. §§ 621(c) and (d).

On January 28, 1985, having found that affidavits submitted by Carole and Gerald sufficed to demonstrate that the two were cohabiting at conception and birth and that Gerald was neither sterile nor impotent, the Superior Court granted Gerald's motion for summary judgment, rejecting Michael's and Victoria's challenges to the constitutionality of § 621. The court also denied their motions for continued visitation pending the appeal under Cal. Civ. Code § 4601, which provides that a court may, in its discretion, grant "reasonable

visitation rights . . . to any . . . person having an interest in the welfare of the child." Cal. Civ. Code Ann. § 4601 (West Supp. 1989). It found that allowing such visitation would "violat[e] the intention of the Legislature by impugning the integrity of the family unit." Supp. App. to Juris. Statement A–91.

On appeal, Michael asserted, *inter alia*, that the Superior Court's application of § 621 had violated his procedural and substantive due process rights. Victoria also raised a due process challenge to the statute, seeking to preserve her *de facto* relationship with Michael as well as with Gerald. She contended, in addition, that as § 621 allows the husband and, at least to a limited extent, the mother, but not the child, to rebut the presumption of legitimacy, it violates the child's right to equal protection. Finally, she asserted a right to continued visitation with Michael under § 4601. After submission of briefs and a hearing, the California Court of Appeal affirmed the judgment of the Superior Court and upheld the constitutionality of the statute. 191 Cal. App. 3d 995, 236 Cal. Rptr. 810 (1987). It interpreted that judgment, moreover, as having denied permanent visitation rights under § 4601, regarding that as the implication of the Superior Court's reliance upon § 621 and upon an earlier California case, *Vincent B. v. Joan R.*, 126 Cal. App. 3d 619, 179 Cal. Rptr. 9 (1981), appeal dism'd, 459 U. S. 807 (1982), which had held that once an assertion of biological paternity is "determined to be legally impossible" under § 621, visitation against the wishes of the mother should be denied under § 4601. 126 Cal. App. 3d, at 627–628, 179 Cal. Rptr., at 13.

The Court of Appeal denied Michael's and Victoria's petitions for rehearing, and, on July 30, 1987, the California Supreme Court denied discretionary review. On February 29, 1988, we noted probable jurisdiction of the present appeal. 485 U. S. 903. Before us, Michael and Victoria both raise equal protection and due process challenges. We do not reach Michael's equal protection claim, however, as it

was neither raised nor passed upon below.   See *Bankers Life & Casualty Co.* v. *Crenshaw*, 486 U. S. 71 (1988).

## II

The California statute that is the subject of this litigation is, in substance, more than a century old.   California Code of Civ. Proc. § 1962(5), enacted in 1872, provided that "[t]he issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate."   In 1955, the legislature amended the statute by adding the preface: "Notwithstanding any other provision of law."   1955 Cal. Stats., ch. 948, p. 1835, § 3.   In 1965, when California's Evidence Code was adopted, the statute was codified as § 621, with no substantive change except replacement of the word "indisputably" with "conclusively," 1965 Cal. Stats., ch. 299, § 2, pp. 1297, 1308.   When California adopted the Uniform Parentage Act, 1975 Cal. Stats., ch. 1244, § 11, pp. 3196–3201, codified at Cal. Civ. Code Ann. § 7000 *et seq.* (West 1983), it amended § 621 by replacing the word "legitimate" with the phrase "a child of the marriage" and by adding nonsterility to nonimpotence and cohabitation as a predicate for the presumption.   1975 Cal. Stats., ch. 1244, § 13, p. 3202.   In 1980, the legislature again amended the statute to provide the husband an opportunity to introduce blood-test evidence in rebuttal of the presumption, 1980 Cal. Stats., ch. 1310, p. 4433; and in 1981 amended it to provide the mother such an opportunity, 1981 Cal. Stats., ch. 1180, p. 4761.   In their present form, the substantive provisions of the statute are as follows:

> "§ 621.   Child of the marriage; notice of motion for blood tests
>
> "(a) Except as provided in subdivision (b), the issue of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage.

"(b)  Notwithstanding the provisions of subdivision (a), if the court finds that the conclusions of all the experts, as disclosed by the evidence based upon blood tests performed pursuant to Chapter 2 (commencing with Section 890) of Division 7 are that the husband is not the father of the child, the question of paternity of the husband shall be resolved accordingly.

"(c)  The notice of motion for blood tests under subdivision (b) may be raised by the husband not later than two years from the child's date of birth.

"(d)  The notice of motion for blood tests under subdivision (b) may be raised by the mother of the child not later than two years from the child's date of birth if the child's biological father has filed an affidavit with the court acknowledging paternity of the child.

"(e)  The provisions of subdivision (b) shall not apply to any case coming within the provisions of Section 7005 of the Civil Code [dealing with artificial insemination] or to any case in which the wife, with the consent of the husband, conceived by means of a surgical procedure."

## III

We address first the claims of Michael.   At the outset, it is necessary to clarify what he sought and what he was denied. California law, like nature itself, makes no provision for dual fatherhood.   Michael was seeking to be declared *the* father of Victoria.   The immediate benefit he evidently sought to obtain from that status was visitation rights.   See Cal. Civ. Code Ann. § 4601 (West 1983) (parent has statutory right to visitation "unless it is shown that such visitation would be detrimental to the best interests of the child").   But if Michael were successful in being declared the father, other rights would follow—most importantly, the right to be considered as the parent who should have custody, Cal. Civ. Code Ann. § 4600 (West 1983), a status which "embrace[s] the sum of parental rights with respect to the rearing of a child, including the child's care; the right to the child's services and

earnings; the right to direct the child's activities; the right to make decisions regarding the control, education, and health of the child; and the right, as well as the duty, to prepare the child for additional obligations, which includes the teaching of moral standards, religious beliefs, and elements of good citizenship." 4 California Family Law § 60.02[1][b] (C. Markey ed. 1987) (footnotes omitted). All parental rights, including visitation, were automatically denied by denying Michael status as the father. While Cal. Civ. Code Ann. § 4601 places it within the discretionary power of a court to award visitation rights to a nonparent, the Superior Court here, affirmed by the Court of Appeal, held that California law denies visitation, against the wishes of the mother, to a putative father who has been prevented by § 621 from establishing his paternity. See 191 Cal. App. 3d, at 1013, 236 Cal. Rptr., at 821, citing *Vincent B.* v. *Joan R.*, 126 Cal. App. 3d, at 627–628 179 Cal. Rptr., at 13.

Michael raises two related challenges to the constitutionality of § 621. First, he asserts that requirements of procedural due process prevent the State from terminating his liberty interest in his relationship with his child without affording him an opportunity to demonstrate his paternity in an evidentiary hearing. We believe this claim derives from a fundamental misconception of the nature of the California statute. While § 621 is phrased in terms of a presumption, that rule of evidence is the implementation of a substantive rule of law. California declares it to be, except in limited circumstances, *irrelevant* for paternity purposes whether a child conceived during, and born into, an existing marriage was begotten by someone other than the husband and had a prior relationship with him. As the Court of Appeal phrased it:

> " 'The conclusive presumption is actually a substantive rule of law based upon a determination by the Legislature as a matter of overriding social policy, that given a certain relationship between the husband and wife, the husband is to be held responsible for the child, and that

the integrity of the family unit should not be impugned.'" 191 Cal. App. 3d, at 1005, 236 Cal. Rptr., at 816, quoting *Vincent B.* v. *Joan R., supra,* at 623, 179 Cal. Rptr., at 10.

Of course the conclusive presumption not only expresses the State's substantive policy but also furthers it, excluding inquiries into the child's paternity that would be destructive of family integrity and privacy.[1]

This Court has struck down as illegitimate certain "irrebuttable presumptions." See, *e. g., Stanley* v. *Illinois,* 405 U. S. 645 (1972); *Vlandis* v. *Kline,* 412 U. S. 441 (1973); *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974). Those holdings did not, however, rest upon *procedural* due process. A conclusive presumption does, of course, foreclose the person against whom it is invoked from demonstrating, in a particularized proceeding, that applying the presumption to him will in fact not further the lawful governmental policy the presumption is designed to effectuate. But the same can be said of any legal rule that establishes general classifications, whether framed in terms of a presumption or not. In this respect there is no difference between a rule which says that the marital husband shall be irrebuttably presumed to be the father, and a rule which says that the adulterous natural father shall not be recognized as the legal father. *Both* rules deny someone in Michael's situation a hearing on whether, in the particular circumstances of his case, California's policies would best be served by giving him parental rights. Thus, as many commentators have observed, see, *e. g.,* Bezanson, Some Thoughts on the Emerging Irrebuttable Presumption Doctrine, 7 Ind. L. Rev. 644 (1974); Nowak, Realigning

---

[1] In those circumstances in which California allows a natural father to rebut the presumption of legitimacy of a child born to a married woman, *e. g.,* where the husband is impotent or sterile, or where the husband and wife have not been cohabiting, it is more likely that the husband already knows the child is not his, and thus less likely that the paternity hearing will disrupt an otherwise harmonious and apparently exclusive marital relationship.

the Standards of Review Under the Equal Protection Guarantee—Prohibited, Neutral, and Permissive Classifications, 62 Geo. L. J. 1071, 1102–1106 (1974); Note, Irrebuttable Presumptions: An Illusory Analysis, 27 Stan. L. Rev. 449 (1975); Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv. L. Rev. 1534 (1974), our "irrebuttable presumption" cases must ultimately be analyzed as calling into question not the adequacy of procedures but—like our cases involving classifications framed in other terms, see, *e. g.*, *Craig* v. *Boren*, 429 U. S. 190 (1976); *Carrington* v. *Rash*, 380 U. S. 89 (1965)—the adequacy of the "fit" between the classification and the policy that the classification serves.   See *LaFleur, supra*, at 652 (Powell, J., concurring in result); *Vlandis, supra*, at 456–459 (WHITE, J., concurring), 466–469 (REHNQUIST, J., dissenting); *Weinberger* v. *Salfi*, 422 U. S. 749 (1975).   We therefore reject Michael's procedural due process challenge and proceed to his substantive claim.

Michael contends as a matter of substantive due process that, because he has established a parental relationship with Victoria, protection of Gerald's and Carole's marital union is an insufficient state interest to support termination of that relationship.   This argument is, of course, predicated on the assertion that Michael has a constitutionally protected liberty interest in his relationship with Victoria.

It is an established part of our constitutional jurisprudence that the term "liberty" in the Due Process Clause extends beyond freedom from physical restraint.   See, *e. g.*, *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923).   Without that core textual meaning as a limitation, defining the scope of the Due Process Clause "has at times been a treacherous field for this Court," giving "reason for concern lest the only limits to . . . judicial intervention become the predilections of those who happen at the time to be Members of this Court."   *Moore* v. *East Cleveland*, 431 U. S. 494, 502 (1977).   The need for restraint has been cogently expressed by JUSTICE WHITE:

122

"That the Court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers . . . , the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority."
*Moore, supra,* at 544 (dissenting opinion).

In an attempt to limit and guide interpretation of the Clause, we have insisted not merely that the interest denominated as a "liberty" be "fundamental" (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society.[2] As we have put it, the Due Process Clause affords only those protections "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105 (1934) (Cardozo, J.). Our cases reflect "continual insistence upon respect for the teachings of history [and] solid recogni-

---

[2] We do not understand what JUSTICE BRENNAN has in mind by an interest "that society traditionally has thought important . . . without protecting it." *Post,* at 140. The protection need not take the form of an explicit constitutional provision or statutory guarantee, but it must at least exclude (all that is necessary to decide the present case) a societal tradition of enacting laws *denying* the interest. Nor do we understand why our practice of limiting the Due Process Clause to traditionally protected interests turns the Clause "into a redundancy," *post,* at 141. Its purpose is to prevent future generations from lightly casting aside important traditional values—not to enable this Court to invent new ones.

tion of the basic values that underlie our society. . . ." *Griswold* v. *Connecticut*, 381 U. S. 479, 501 (1965) (Harlan, J., concurring in judgment).

This insistence that the asserted liberty interest be rooted in history and tradition is evident, as elsewhere, in our cases according constitutional protection to certain parental rights. Michael reads the landmark case of *Stanley* v. *Illinois*, 405 U. S. 645 (1972), and the subsequent cases of *Quilloin* v. *Walcott*, 434 U. S. 246 (1978), *Caban* v. *Mohammed*, 441 U. S. 380 (1979), and *Lehr* v. *Robertson*, 463 U. S. 248 (1983), as establishing that a liberty interest is created by biological fatherhood plus an established parental relationship—factors that exist in the present case as well. We think that distorts the rationale of those cases. As we view them, they rest not upon such isolated factors but upon the historic respect—indeed, sanctity would not be too strong a term—traditionally accorded to the relationships that develop within the unitary family.[3] See *Stanley, supra,* at 651; *Quilloin, supra,* at 254–255; *Caban, supra,* at 389; *Lehr, supra,* at 261. In *Stanley,* for example, we forbade the destruction of such a family when, upon the death of the mother, the State had sought to remove children from the custody of a father who had lived with and supported them and their mother for 18 years. As Justice Powell stated for the plurality in *Moore* v. *East Cleveland, supra,* at 503: "Our

---

[3] JUSTICE BRENNAN asserts that only a "pinched conception of 'the family'" would exclude Michael, Carole, and Victoria from protection. *Post,* at 145. We disagree. The family unit accorded traditional respect in our society, which we have referred to as the "unitary family," is typified, of course, by the marital family, but also includes the household of unmarried parents and their children. Perhaps the concept can be expanded even beyond this, but it will bear no resemblance to traditionally respected relationships—and will thus cease to have any constitutional significance—if it is stretched so far as to include the relationship established between a married woman, her lover, and their child, during a 3-month sojourn in St. Thomas, or during a subsequent 8-month period when, if he happened to be in Los Angeles, he stayed with her and the child.

.

decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."

Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection. We think it impossible to find that it has. In fact, quite to the contrary, our traditions have protected the marital family (Gerald, Carole, and the child they acknowledge to be theirs) against the sort of claim Michael asserts.[4]

The presumption of legitimacy was a fundamental principle of the common law. H. Nicholas, Adulturine Bastardy 1 (1836). Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period. *Id.*, at 9–10 (citing Bracton, De Legibus et Consuetudinibus Angliae, bk. i, ch. 9, p. 6; bk. ii, ch. 29, p. 63, ch. 32, p. 70 (1569)). As explained by Blackstone, nonaccess could only be proved "if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, *extra quatuor maria* [beyond the four seas]) for above nine months. . . ." 1 Blackstone's Commentaries 456 (J. Chitty ed. 1826). And, under the common law both in England and here, "neither

---

[4] JUSTICE BRENNAN insists that in determining whether a liberty interest exists we must look at Michael's relationship with Victoria in isolation, without reference to the circumstance that Victoria's mother was married to someone else when the child was conceived, and that that woman and her husband wish to raise the child as their own. See *post*, at 145–146. We cannot imagine what compels this strange procedure of looking at the act which is assertedly the subject of a liberty interest in isolation from its effect upon other people—rather like inquiring whether there is a liberty interest in firing a gun where the case at hand happens to involve its discharge into another person's body. The logic of JUSTICE BRENNAN's position leads to the conclusion that if Michael had begotten Victoria by rape, that fact would in no way affect his possession of a liberty interest in his relationship with her.

husband nor wife [could] be a witness to prove access or nonaccess." J. Schouler, Law of the Domestic Relations § 225, p. 306 (3d ed. 1882); R. Graveson & F. Crane, A Century of Family Law: 1857–1957, p. 158 (1957). The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption appears to have been an aversion to declaring children illegitimate, see Schouler, *supra*, § 225, at 306–307; M. Grossberg, Governing the Hearth 201 (1985), thereby depriving them of rights of inheritance and succession, 2 J. Kent, Commentaries on American Law *175, and likely making them wards of the state. A secondary policy concern was the interest in promoting the "peace and tranquillity of States and families," Schouler, *supra*, § 225, at 304, quoting Boullenois, Traité des Status, bk. 1, p. 62, a goal that is obviously impaired by facilitating suits against husband and wife asserting that their children are illegitimate. Even though, as bastardy laws became less harsh, "[j]udges in both [England and the United States] gradually widened the acceptable range of evidence that could be offered by spouses, and placed restraints on the 'four seas rule' . . . [,] the law retained a strong bias against ruling the children of married women illegitimate." Grossberg, *supra*, at 202.

We have found nothing in the older sources, nor in the older cases, addressing specifically the power of the natural father to assert parental rights over a child born into a woman's existing marriage with another man. Since it is Michael's burden to establish that such a power (at least where the natural father has established a relationship with the child) is so deeply embedded within our traditions as to be a fundamental right, the lack of evidence alone might defeat his case. But the evidence shows that even in modern times — when, as we have noted, the rigid protection of the marital family has in other respects been relaxed—the ability of a person in Michael's position to claim paternity has not been generally acknowledged. For example, a 1957 annotation on the subject: "Who may dispute presumption of legitimacy of

child conceived or born during wedlock," 53 A. L. R. 2d 572, shows three States (including California) with statutes limiting standing to the husband or wife and their descendants, one State (Louisiana) with a statute limiting it to the husband, two States (Florida and Texas) with judicial decisions limiting standing to the husband, and two States (Illinois and New York) with judicial decisions denying standing even to the mother.    Not a single decision is set forth specifically according standing to the natural father, and "express indications of the nonexistence of any . . . limitation" upon standing were found only "in a few jurisdictions."    *Id.*, at 579.

Moreover, even if it were clear that one in Michael's position generally possesses, and has generally always possessed, standing to challenge the marital child's legitimacy, that would still not establish Michael's case.    As noted earlier, what is at issue here is not entitlement to a state pronouncement that Victoria was begotten by Michael.    It is no conceivable denial of constitutional right for a State to decline to declare facts unless some legal consequence hinges upon the requested declaration.    What Michael asserts here is a right to have himself declared the natural father *and thereby to obtain parental prerogatives.*[5]    What he must establish, therefore, is not that our society has traditionally allowed a natural father in his circumstances to establish paternity, but that it has traditionally accorded such a father parental rights, or at least has not traditionally denied them.    Even if the law in all States had always been that the entire world could chal-

---

[5] According to JUSTICE BRENNAN, Michael does not claim—and in order to prevail here need not claim—a substantive right to maintain a parental relationship with Victoria, but merely the right to "a hearing on the issue" of his paternity.    *Post*, at 156, n. 12.    "Michael's challenge . . . does not depend," we are told, "on his ability ultimately to obtain visitation rights."    *Post*, at 147.    To be sure it does not depend upon his ability ultimately to *obtain* those rights, but it surely depends upon his *asserting a claim* to those rights, which is precisely what JUSTICE BRENNAN denies. We cannot grasp the concept of a "right to a hearing" on the part of a person who claims no substantive entitlement that the hearing will assertedly vindicate.

lenge the marital presumption and obtain a declaration as to who was the natural father, that would not advance Michael's claim. Thus, it is ultimately irrelevant, even for purposes of determining *current* social attitudes towards the alleged substantive right Michael asserts, that the present law in a number of States appears to allow the natural father—including the natural father who has not established a relationship with the child—the theoretical power to rebut the marital presumption, see Note, Rebutting the Marital Presumption: A Developed Relationship Test, 88 Colum. L. Rev. 369, 373 (1988). What counts is whether the States in fact award substantive parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child. We are not aware of a single case, old or new, that has done so. This is not the stuff of which fundamental rights qualifying as liberty interests are made.[6]

---

[6] JUSTICE BRENNAN criticizes our methodology in using historical traditions specifically relating to the rights of an adulterous natural father, rather than inquiring more generally "whether parenthood is an interest that historically has received our attention and protection." *Post*, at 139. There seems to us no basis for the contention that this methodology is "nove[l]," *post*, at 140. For example, in *Bowers* v. *Hardwick*, 478 U. S. 186 (1986), we noted that at the time the Fourteenth Amendment was ratified all but 5 of the 37 States had criminal sodomy laws, that all 50 of the States had such laws prior to 1961, and that 24 States and the District of Columbia continued to have them; and we concluded from that record, regarding that very specific aspect of sexual conduct, that "to claim that a right to engage in such conduct is 'deeply rooted in this Nation's history and tradition' or 'implicit in the concept of ordered liberty' is, at best, facetious." *Id.*, at 194. In *Roe* v. *Wade*, 410 U. S. 113 (1973), we spent about a fifth of our opinion negating the proposition that there was a longstanding tradition of laws proscribing abortion. *Id.*, at 129–141.

We do not understand why, having rejected our focus upon the societal tradition regarding the natural father's rights vis-à-vis a child whose mother is married to another man, JUSTICE BRENNAN would choose to focus instead upon "parenthood." Why should the relevant category not be even more general—perhaps "family relationships"; or "personal relationships"; or even "emotional attachments in general"? Though the dissent has no basis for the level of generality it would select, we do: We refer

In *Lehr v. Robertson*, a case involving a natural father's attempt to block his child's adoption by the unwed mother's new husband, we observed that "[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship

---

to the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified. If, for example, there were no societal tradition, either way, regarding the rights of the natural father of a child adulterously conceived, we would have to consult, and (if possible) reason from, the traditions regarding natural fathers in general. But there is such a more specific tradition, and it unqualifiedly denies protection to such a parent.

One would think that JUSTICE BRENNAN would appreciate the value of consulting the most specific tradition available, since he acknowledges that "[e]ven if we can agree . . . that 'family' and 'parenthood' are part of the good life, it is absurd to assume that we can agree on the content of those terms and destructive to pretend that we do." *Post*, at 141. Because such general traditions provide such imprecise guidance, they permit judges to dictate rather than discern the society's views. The need, if arbitrary decisionmaking is to be avoided, to adopt the most specific tradition as the point of reference—or at least to announce, as JUSTICE BRENNAN declines to do, some other criterion for selecting among the innumerable relevant traditions that could be consulted—is well enough exemplified by the fact that in the present case JUSTICE BRENNAN's opinion and JUSTICE O'CONNOR's opinion, *post*, p. 132, which disapproves this footnote, *both* appeal to tradition, but on the basis of the tradition they select reach opposite results. Although assuredly having the virtue (if it be that) of leaving judges free to decide as they think best when the unanticipated occurs, a rule of law that binds neither by text nor by any particular, identifiable tradition is no rule of law at all.

Finally, we may note that this analysis is not inconsistent with the result in cases such as *Griswold v. Connecticut*, 381 U. S. 479 (1965), or *Eisenstadt v. Baird*, 405 U. S. 438 (1972). None of those cases acknowledged a longstanding and still extant societal tradition withholding the very right pronounced to be the subject of a liberty interest and then rejected it. JUSTICE BRENNAN must do so here. In this case, the existence of such a tradition, continuing to the present day, refutes any possible contention that the alleged right is "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts*, 291 U. S. 97, 105 (1934), or "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U. S. 319, 325 (1937).

with his offspring," 463 U. S., at 262, and we assumed that the Constitution might require some protection of that opportunity, *id.*, at 262–265. Where, however, the child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter. In *Lehr* we quoted approvingly from Justice Stewart's dissent in *Caban* v. *Mohammed,* 441 U. S., at 397, to the effect that although " '[i]n some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father,' " " 'the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever substantive constitutional claims might otherwise exist.' " 463 U. S., at 260, n. 16. In accord with our traditions, a limit is also imposed by the circumstance that the mother is, at the time of the child's conception and birth, married to, and cohabitating with, another man, both of whom wish to raise the child as the offspring of their union.[7] It is a question of legislative policy and not constitutional law whether

---

[7] JUSTICE BRENNAN chides us for thus limiting our holding to situations in which, as here, the husband and wife wish to raise her child jointly. The dissent believes that without this limitation we would be unable to "rely on the State's asserted interest in protecting the 'unitary family' in denying that Michael and Victoria have been deprived of liberty." *Post,* at 147. As we have sought to make clear, however, and as the dissent elsewhere seems to understand, see *post,* at 139, 140–141, 145, 147, we rest our decision not upon our independent "balancing" of such interests, but upon the absence of any constitutionally protected right to legal parentage on the part of an adulterous natural father in Michael's situation, as evidenced by long tradition. That tradition reflects a "balancing" that has already been made by society itself. We limit our pronouncement to the relevant facts of this case because it is at least possible that our traditions lead to a different conclusion with regard to adulterous fathering of a child whom the marital parents do not wish to raise as their own. It seems unfair for those who disagree with our holding to include among their criticisms that we have not extended the holding more broadly.

California will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted.

We do not accept JUSTICE BRENNAN's criticism that this result "squashes" the liberty that consists of "the freedom not to conform." *Post*, at 141. It seems to us that reflects the erroneous view that there is only one side to this controversy—that one disposition can expand a "liberty" of sorts without contracting an equivalent "liberty" on the other side. Such a happy choice is rarely available. Here, to *provide* protection to an adulterous natural father is to *deny* protection to a marital father, and vice versa. If Michael has a "freedom not to conform" (whatever that means), Gerald must equivalently have a "freedom to conform." One of them will pay a price for asserting that "freedom"—Michael by being unable to act as father of the child he has adulterously begotten, or Gerald by being unable to preserve the integrity of the traditional family unit he and Victoria have established. Our disposition does not choose between these two "freedoms," but leaves that to the people of California. JUSTICE BRENNAN's approach chooses one of them as the constitutional imperative, on no apparent basis except that the unconventional is to be preferred.

## IV

We have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship. We need not do so here because, even assuming that such a right exists, Victoria's claim must fail. Victoria's due process challenge is, if anything, weaker than Michael's. Her basic claim is not that California has erred in preventing her from establishing that Michael, not Gerald, should stand as her legal father. Rather, she claims a due process right to maintain filial relationships with both Michael and Gerald. This assertion merits little discussion, for, whatever the merits of the guardian

ad litem's belief that such an arrangement can be of great psychological benefit to a child, the claim that a State must recognize multiple fatherhood has no support in the history or traditions of this country. Moreover, even if we were to construe Victoria's argument as forwarding the lesser proposition that, whatever her status vis-à-vis Gerald, she has a liberty interest in maintaining a filial relationship with her natural father, Michael, we find that, at best, her claim is the obverse of Michael's and fails for the same reasons.

Victoria claims in addition that her equal protection rights have been violated because, unlike her mother and presumed father, she had no opportunity to rebut the presumption of her legitimacy. We find this argument wholly without merit. We reject, at the outset, Victoria's suggestion that her equal protection challenge must be assessed under a standard of strict scrutiny because, in denying her the right to maintain a filial relationship with Michael, the State is discriminating against her on the basis of her illegitimacy. See *Gomez* v. *Perez*, 409 U. S. 535, 538 (1973). Illegitimacy is a legal construct, not a natural trait. Under California law, Victoria is not illegitimate, and she is treated in the same manner as all other legitimate children: she is entitled to maintain a filial relationship with her legal parents.

We apply, therefore, the ordinary "rational relationship" test to Victoria's equal protection challenge. The primary rationale underlying § 621's limitation on those who may rebut the presumption of legitimacy is a concern that allowing persons other than the husband or wife to do so may undermine the integrity of the marital union. When the husband or wife contests the legitimacy of their child, the stability of the marriage has already been shaken. In contrast, allowing a claim of illegitimacy to be pressed by the child—or, more accurately, by a court-appointed guardian ad litem—may well disrupt an otherwise peaceful union. Since it pursues a legitimate end by rational means, California's de-

cision to treat Victoria differently from her parents is not a denial of equal protection.

The judgment of the California Court of Appeal is

*Affirmed.*

JUSTICE O'CONNOR, with whom JUSTICE KENNEDY joins, concurring in part.

I concur in all but footnote 6 of JUSTICE SCALIA's opinion. This footnote sketches a mode of historical analysis to be used when identifying liberty interests protected by the Due Process Clause of the Fourteenth Amendment that may be somewhat inconsistent with our past decisions in this area. See *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972). On occasion the Court has characterized relevant traditions protecting asserted rights at levels of generality that might not be "the most specific level" available. *Ante*, at 127–128, n. 6. See *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967); *Turner* v. *Safley*, 482 U. S. 78, 94 (1987); cf. *United States* v. *Stanley*, 483 U. S. 669, 709 (1987) (O'CONNOR, J., concurring in part and dissenting in part). I would not foreclose the unanticipated by the prior imposition of a single mode of historical analysis. *Poe* v. *Ullman*, 367 U. S. 497, 542, 544 (1961) (Harlan, J., dissenting).

JUSTICE STEVENS, concurring in the judgment.

As I understand this case, it raises two different questions about the validity of California's statutory scheme. First, is Cal. Evid. Code Ann. § 621 (West Supp. 1989) unconstitutional because it prevents Michael and Victoria from obtaining a judicial determination that he is her biological father—even if no legal rights would be affected by that determination? Second, does the California statute deny appellants a fair opportunity to prove that Victoria's best interests would be served by granting Michael visitation rights?

On the first issue I agree with JUSTICE SCALIA that the Federal Constitution imposes no obligation upon a State to

"declare facts unless some legal consequence hinges upon the requested declaration." *Ante,* at 126. "The actions of judges neither create nor sever genetic bonds." *Lehr* v. *Robertson,* 463 U. S. 248, 261 (1983).

On the second issue I do not agree with JUSTICE SCALIA's analysis. He seems to reject the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth. I think cases like *Stanley* v. *Illinois,* 405 U. S. 645 (1972), and *Caban* v. *Mohammed,* 441 U. S. 380 (1979), demonstrate that enduring "family" relationships may develop in unconventional settings. I therefore would not foreclose the possibility that a constitutionally protected relationship between a natural father and his child might exist in a case like this. Indeed, I am willing to assume for the purpose of deciding this case that Michael's relationship with Victoria is strong enough to give him a constitutional right to try to convince a trial judge that Victoria's best interest would be served by granting him visitation rights. I am satisfied, however, that the California statute, as applied in this case, gave him that opportunity.

Section 4601 of the California Civil Code Annotated (West Supp. 1989) provides:

> "[R]easonable visitation rights [shall be awarded] to a parent unless it is shown that the visitation would be detrimental to the best interests of the child. In the discretion of the court, reasonable visitation rights may be granted *to any other person having an interest in the welfare of the child.*" (Emphasis added.)

The presumption established by § 621 denied Michael the benefit of the first sentence of § 4601 because, as a matter of law, he is not a "parent." It does not, however, prevent him from proving that he is an "other person having an interest in the welfare of the child." On its face, therefore, the statute

plainly gave the trial judge the authority to grant Michael "reasonable visitation rights."

I recognize that my colleagues have interpreted § 621 as creating an absolute bar that would prevent a California trial judge from regarding the natural father as either a "parent" within the meaning of the first sentence of § 4601 *or* as "any other person" within the meaning of the second sentence. See *ante*, at 116, 119; *post*, at 148–151 (BRENNAN, J., dissenting). That is not only an unnatural reading of the statute's plain language, but it is also not consistent with the California courts' reading of the statute. Thus, in *Vincent B.* v. *Joan R.*, 126 Cal. App. 3d 619, 179 Cal. Rptr. 9 (1981), appeal dism'd, 459 U. S. 807 (1982), the California Court of Appeal, after deciding that the § 621 presumption barred a natural father from proving paternity, went on to consider the separate question whether it would be proper to allow visitation pursuant to the second sentence of § 4601:

> "Finally, appellant contends that even if Frank is conclusively presumed to be Z.'s father, appellant should be allowed visitation rights, since Civil Code section 4601 gives discretion to grant visitation rights to 'any other person having an interest in the welfare of the child.' We think it obvious that *in the circumstances of this case* such court-ordered visitation would be detrimental to the best interests of the child. Appellant's interest in visiting the child is based on his claim that appellant is Z.'s father. Such claim is now determined to be legally impossible. The mother does not wish the child to be visited by appellant. Confusion, uncertainty, and embarrassment to the child would likely result from a court order that appellant, who claims to be Z.'s biological father, is entitled to visitation against the wishes of the mother. (*Petitioner F.* v. *Respondent R.*, *supra*, 430 A. 2d 1075, 1080.)" 126 Cal. App. 3d, at 627–628, 179 Cal. Rptr., at 13 (emphasis added).

Supporting the court's decision that granting visitation rights to Vincent would be contrary to the child's best interests was the fact that "unlike the putative fathers in *Stanley* [v. *Illinois*, 405 U. S. 645 (1972),] and *[In re] Lisa R.* [, 13 Cal. 3d 636, 532 P. 2d 123 (1975)], appellant has never lived with the mother and child, nor has he ever supported the child." 126 Cal. App. 3d, at 626, 179 Cal. Rptr., at 12.

Similarly, in this case, the trial judge not only found the conclusive presumption applicable, but also separately considered the effect of § 4601 and expressly found "that, at the present time, it is not in the best interests of the child that the Plaintiff have visitation. The Court believes that the existence of two (2) 'fathers' as male authority figures will confuse the child and be counter-productive to her best interests." Supp. App. to Juris. Statement A–90 — A–91. In its opinion, the Court of Appeal also concluded that Michael "is not entitled to rights of visitation under section 4601," see 191 Cal. App. 3d 995, 1013, 236 Cal. Rptr. 810, 821 (1987), and then quoted the above excerpt from the opinion in *Vincent B.* v. *Joan R.* As I read that opinion, it does not support the view that a natural father *cannot* be an "other person" within the meaning of § 4601; rather, it indicates that the outcome depends largely on "the circumstances of th[e] case."*

Under the circumstances of the case before us, Michael was given a fair opportunity to show that he is Victoria's natural father, that he had developed a relationship with her, and that her interests would be served by granting him visitation rights. On the other hand, the record also shows that after its rather shaky start, the marriage between Carole and Gerald developed a stability that now provides Victoria with

---

*For cases showing the California courts' willingness to decide § 621 cases on a case-by-case basis, see, *e. g.*, *Michelle W.* v. *Ronald W.*, 39 Cal. 3d 354, 703 P. 2d 88 (1985), app. dism'd, 474 U. S. 1043 (1986); *In re Lisa R.*, 13 Cal. 3d 636, 532 P. 2d 123, cert. denied *sub nom. Porzuczek* v. *Towner*, 421 U. S. 1014 (1975).

a loving and harmonious family home. In the circumstances of this case, I find nothing fundamentally unfair about the exercise of a judge's discretion that, in the end, allows the mother to decide whether her child's best interests would be served by allowing the natural father visitation privileges. Because I am convinced that the trial judge had the authority under state law both to hear Michael's plea for visitation rights and to grant him such rights if Victoria's best interests so warranted, I am satisfied that the California statutory scheme is consistent with the Due Process Clause of the Fourteenth Amendment.

I therefore concur in the Court's judgment of affirmance.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

In a case that has yielded so many opinions as has this one, it is fruitful to begin by emphasizing the common ground shared by a majority of this Court. Five Members of the Court refuse to foreclose "the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth." *Ante*, at 133 (STEVENS, J., concurring in judgment); see *infra*, at 141–147; *post*, at 157 (WHITE, J., dissenting). Five Justices agree that the flaw inhering in a conclusive presumption that terminates a constitutionally protected interest without any hearing whatsoever is a *procedural* one. See *infra*, at 153; *post*, at 163 (WHITE, J., dissenting); *ante*, at 132 (STEVENS, J., concurring in judgment). Four Members of the Court agree that Michael H. has a liberty interest in his relationship with Victoria, see *infra*, at 143; *post*, at 157 (WHITE, J., dissenting), and one assumes for purposes of this case that he does, see *ante*, at 133 (STEVENS, J., concurring in judgment).

In contrast, only one other Member of the Court fully endorses JUSTICE SCALIA's view of the proper method of analyzing questions arising under the Due Process Clause.

See *ante*, at 113; *ante*, at 132 (O'CONNOR, J., concurring in part). Nevertheless, because the plurality opinion's exclusively historical analysis portends a significant and unfortunate departure from our prior cases and from sound constitutional decisionmaking, I devote a substantial portion of my discussion to it.

I

Once we recognized that the "liberty" protected by the Due Process Clause of the Fourteenth Amendment encompasses more than freedom from bodily restraint, today's plurality opinion emphasizes, the concept was cut loose from one natural limitation on its meaning. This innovation paved the way, so the plurality hints, for judges to substitute their own preferences for those of elected officials. Dissatisfied with this supposedly unbridled and uncertain state of affairs, the plurality casts about for another limitation on the concept of liberty.

It finds this limitation in "tradition." Apparently oblivious to the fact that this concept can be as malleable and as elusive as "liberty" itself, the plurality pretends that tradition places a discernible border around the Constitution. The pretense is seductive; it would be comforting to believe that a search for "tradition" involves nothing more idiosyncratic or complicated than poring through dusty volumes on American history. Yet, as JUSTICE WHITE observed in his dissent in *Moore* v. *East Cleveland*, 431 U. S. 494, 549 (1977): "What the deeply rooted traditions of the country are is arguable." Indeed, wherever I would begin to look for an interest "deeply rooted in the country's traditions," one thing is certain: I would not stop (as does the plurality) at Bracton, or Blackstone, or Kent, or even the American Law Reports in conducting my search. Because reasonable people can disagree about the content of particular traditions, and because they can disagree even about which traditions are relevant to the definition of "liberty," the plurality has not found the objective boundary that it seeks.

Even if we could agree, moreover, on the content and significance of particular traditions, we still would be forced to identify the point at which a tradition becomes firm enough to be relevant to our definition of liberty and the moment at which it becomes too obsolete to be relevant any longer. The plurality supplies no objective means by which we might make these determinations. Indeed, as soon as the plurality sees signs that the tradition upon which it bases its decision (the laws denying putative fathers like Michael standing to assert paternity) is crumbling, it shifts ground and says that the case has nothing to do with that tradition, after all. "[W]hat is at issue here," the plurality asserts after canvassing the law on paternity suits, "is not entitlement to a state pronouncement that Victoria was begotten by Michael." *Ante*, at 126. But that is precisely what is at issue here, and the plurality's last-minute denial of this fact dramatically illustrates the subjectivity of its own analysis.

It is ironic that an approach so utterly dependent on tradition is so indifferent to our precedents. Citing barely a handful of this Court's numerous decisions defining the scope of the liberty protected by the Due Process Clause to support its reliance on tradition, the plurality acts as though English legal treatises and the American Law Reports always have provided the sole source for our constitutional principles. They have not. Just as common-law notions no longer define the "property" that the Constitution protects, see *Goldberg* v. *Kelly*, 397 U. S. 254 (1970), neither do they circumscribe the "liberty" that it guarantees. On the contrary, "'[l]iberty' and 'property' are broad and majestic terms. They are among the '[g]reat [constitutional] concepts . . . purposely left to gather meaning from experience. . . . [T]hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.'" *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 571 (1972), quoting *Na-*

*tional Ins. Co.* v. *Tidewater Co.*, 337 U. S. 582, 646 (1949) (Frankfurter, J., dissenting).

It is not that tradition has been irrelevant to our prior decisions. Throughout our decisionmaking in this important area runs the theme that certain interests and practices— freedom from physical restraint, marriage, childbearing, childrearing, and others—form the core of our definition of "liberty." Our solicitude for these interests is partly the result of the fact that the Due Process Clause would seem an empty promise if it did not protect them, and partly the result of the historical and traditional importance of these interests in our society. In deciding cases arising under the Due Process Clause, therefore, we have considered whether the concrete limitation under consideration impermissibly impinges upon one of these more generalized interests.

Today's plurality, however, does not ask whether parenthood is an interest that historically has received our attention and protection; the answer to that question is too clear for dispute. Instead, the plurality asks whether the specific variety of parenthood under consideration—a natural father's relationship with a child whose mother is married to another man—has enjoyed such protection.

If we had looked to tradition with such specificity in past cases, many a decision would have reached a different result. Surely the use of contraceptives by unmarried couples, *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972), or even by married couples, *Griswold* v. *Connecticut*, 381 U. S. 479 (1965); the freedom from corporal punishment in schools, *Ingraham* v. *Wright*, 430 U. S. 651 (1977); the freedom from an arbitrary transfer from a prison to a psychiatric institution, *Vitek* v. *Jones*, 445 U. S. 480 (1980); and even the right to raise one's natural but illegitimate children, *Stanley* v. *Illinois*, 405 U. S. 645 (1972), were not "interest[s] traditionally protected by our society," *ante*, at 122, at the time of their consideration by this Court. If we had asked, therefore, in *Eisenstadt, Griswold, Ingraham, Vitek,* or *Stanley* itself whether

the specific interest under consideration had been traditionally protected, the answer would have been a resounding "no." That we did not ask this question in those cases highlights the novelty of the interpretive method that the plurality opinion employs today.

The plurality's interpretive method is more than novel; it is misguided. It ignores the good reasons for limiting the role of "tradition" in interpreting the Constitution's deliberately capacious language. In the plurality's constitutional universe, we may not take notice of the fact that the original reasons for the conclusive presumption of paternity are out of place in a world in which blood tests can prove virtually beyond a shadow of a doubt who sired a particular child and in which the fact of illegitimacy no longer plays the burdensome and stigmatizing role it once did. Nor, in the plurality's world, may we deny "tradition" its full scope by pointing out that the rationale for the conventional rule has changed over the years, as has the rationale for Cal. Evid. Code Ann. § 621 (West Supp. 1989);[1] instead, our task is simply to identify a rule denying the asserted interest and not to ask whether the basis for that rule—which is the true reflection of the values undergirding it—has changed too often or too recently to call the rule embodying that rationale a "tradition." Moreover, by describing the decisive question as whether Michael's and Victoria's interest is one that has been "traditionally *protected by* our society," *ante,* at 122 (emphasis added), rather than one that society traditionally has thought important (with or without protecting it), and by suggesting that our sole function is to "*discern* the society's views," *ante,* at 128, n. 6 (emphasis added), the plurality acts as if the only pur-

---

[1] See *In re Marriage of Sharyne and Stephen B.,* 124 Cal. App. 3d 524, 528–531, 177 Cal. Rptr. 429, 431–433 (1981) (noting that California courts initially justified conclusive presumption of paternity on the ground that biological paternity was impossible to prove, but that the preservation of family integrity became the rule's paramount justification when paternity tests became reliable).

pose of the Due Process Clause is to confirm the importance of interests already protected by a majority of the States. Transforming the protection afforded by the Due Process Clause into a redundancy mocks those who, with care and purpose, wrote the Fourteenth Amendment.

In construing the Fourteenth Amendment to offer shelter only to those interests specifically protected by historical practice, moreover, the plurality ignores the kind of society in which our Constitution exists. We are not an assimilative, homogeneous society, but a facilitative, pluralistic one, in which we must be willing to abide someone else's unfamiliar or even repellent practice because the same tolerant impulse protects our own idiosyncracies. Even if we can agree, therefore, that "family" and "parenthood" are part of the good life, it is absurd to assume that we can agree on the content of those terms and destructive to pretend that we do. In a community such as ours, "liberty" must include the freedom not to conform. The plurality today squashes this freedom by requiring specific approval from history before protecting anything in the name of liberty.

The document that the plurality construes today is unfamiliar to me. It is not the living charter that I have taken to be our Constitution; it is instead a stagnant, archaic, hidebound document steeped in the prejudices and superstitions of a time long past. *This* Constitution does not recognize that times change, does not see that sometimes a practice or rule outlives its foundations. I cannot accept an interpretive method that does such violence to the charter that I am bound by oath to uphold.

## II

The plurality's reworking of our interpretive approach is all the more troubling because it is unnecessary. This is not a case in which we face a "new" kind of interest, one that requires us to consider for the first time whether the Constitution protects it. On the contrary, we confront an interest — that of a parent and child in their relationship with each

other—that was among the first that this Court acknowledged in its cases defining the "liberty" protected by the Constitution, see, *e. g., Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923); *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942); *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944), and I think I am safe in saying that no one doubts the wisdom or validity of those decisions. Where the interest under consideration is a parent-child relationship, we need not ask, over and over again, whether that interest is one that society traditionally protects.

Thus, to describe the issue in this case as whether the relationship existing between Michael and Victoria "has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection," *ante,* at 124, is to reinvent the wheel. The better approach—indeed, the one commanded by our prior cases and by common sense—is to ask whether the specific parent-child relationship under consideration is close enough to the interests that we already have protected to be deemed an aspect of "liberty" as well. On the facts before us, therefore, the question is not what "level of generality" should be used to describe the relationship between Michael and Victoria, see *ante,* at 127, n. 6, but whether the relationship under consideration is sufficiently substantial to qualify as a liberty interest under our prior cases.

On four prior occasions, we have considered whether unwed fathers have a constitutionally protected interest in their relationships with their children. See *Stanley* v. *Illinois,* 405 U. S. 645 (1972); *Quilloin* v. *Walcott,* 434 U. S. 246 (1978); *Caban* v. *Mohammed,* 441 U. S. 380 (1979); and *Lehr* v. *Robertson,* 463 U. S. 248 (1983). Though different in factual and legal circumstances, these cases have produced a unifying theme: although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do

so.[2]  "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' . . . his interest in personal contact with his child acquires substantial protection under the Due Process Clause.   At that point it may be said that he 'act[s] as a father toward his children.'" *Lehr* v. *Robertson, supra,* at 261, quoting *Caban* v. *Mohammed, supra,* at 392, 389, n. 7.   This commitment is why Mr. Stanley and Mr. Caban won; why Mr. Quilloin and Mr. Lehr lost; and why Michael H. should prevail today.   Michael H. is almost certainly Victoria D.'s natural father, has lived with her as her father, has contributed to her support, and has from the beginning sought to strengthen and maintain his relationship with her.

Claiming that the intent of these cases was to protect the "unitary family," *ante,* at 123, the plurality waves *Stanley, Quilloin, Caban,* and *Lehr* aside.   In evaluating the plurality's dismissal of these precedents, it is essential to identify its conception of the "unitary family."   If, by acknowledging that *Stanley* et al. sought to protect "the relationships that develop within the unitary family," *ibid.,* the plurality meant only to describe the kinds of relationships that develop when parents and children live together (formally or informally) as a family, then the plurality's vision of these cases would be correct.   But that is not the plurality's message.   Though it pays lipservice to the idea that marriage is not the crucial fact in denying constitutional protection to the relationship between Michael and Victoria, *ante,* at 123, n. 3, the plurality cannot mean what it says.

The evidence is undisputed that Michael, Victoria, and Carole did live together as a family; that is, they shared the

---

[2] The plurality's claim that "[t]he logic of [my] position leads to the conclusion that if Michael had begotten Victoria by rape, that fact would in no way affect his possession of a liberty interest in his relationship with her," *ante,* at 124, n. 4, ignores my observation that a mere biological connection is insufficient to establish a liberty interest on the part of an unwed father.

same household, Victoria called Michael "Daddy," Michael contributed to Victoria's support, and he is eager to continue his relationship with her. Yet they are not, in the plurality's view, a "unitary family," whereas Gerald, Carole, and Victoria do compose such a family. The only difference between these two sets of relationships, however, is the fact of marriage. The plurality, indeed, expressly recognizes that marriage is the critical fact in denying Michael a constitutionally protected stake in his relationship with Victoria: no fewer than six times, the plurality refers to Michael as the "*adulterous* natural father" (emphasis added) or the like. *Ante*, at 120; 127, n. 6; 128, n. 6; 129, n. 7; 130. See also *ante*, at 124 (referring to the "*marital* family" of Gerald, Carole, and Victoria) (emphasis added); *ante*, at 129 (plurality's holding limited to those situations in which there is "an extant marital family").[3] However, the very premise of *Stanley* and the cases following it is that marriage is not decisive in answering the question whether the Constitution protects the parental relationship under consideration. These cases are, after all, important precisely because they involve the rights of *unwed* fathers. It is important to remember, moreover, that in *Quilloin, Caban,* and *Lehr,* the putative father's demands would have disrupted a "unitary family" as the plurality defines it; in each case, the husband of the child's mother sought to adopt the child over the objections of the natural father. Significantly, our decisions in those cases in no way relied on the need to protect the marital family. Hence the plurality's claim that *Stanley, Quilloin, Caban,* and *Lehr*

---

[3] In one place, the plurality opinion appears to suggest that the length of time that Michael and Victoria lived together is relevant to the question whether they have a liberty interest in their relationship with each other. See *ante*, at 123, n. 3. The point is not pursued, however, and in any event I am unable to find in the traditions on which the plurality otherwise exclusively relies any emphasis on the duration of the relationship between the putative father and child.

were about the "unitary family," as that family is defined by today's plurality, is surprising indeed.

The plurality's exclusive rather than inclusive definition of the "unitary family" is out of step with other decisions as well. This pinched conception of "the family," crucial as it is in rejecting Michael's and Victoria's claims of a liberty interest, is jarring in light of our many cases preventing the States from denying important interests or statuses to those whose situations do not fit the government's narrow view of the family. From *Loving* v. *Virginia*, 388 U. S. 1 (1967), to *Levy* v. *Louisiana*, 391 U. S. 68 (1968), and *Glona* v. *American Guarantee & Liability Ins. Co.*, 391 U. S. 73 (1968), and from *Gomez* v. *Perez*, 409 U. S. 535 (1973), to *Moore* v. *East Cleveland*, 431 U. S. 494 (1977), we have declined to respect a State's notion, as manifested in its allocation of privileges and burdens, of what the family should be. Today's rhapsody on the "unitary family" is out of tune with such decisions.

The plurality's focus on the "unitary family" is misdirected for another reason. It conflates the question whether a liberty interest exists with the question what procedures may be used to terminate or curtail it. It is no coincidence that we never before have looked at the relationship that the unwed father seeks to disrupt, rather than the one he seeks to preserve, in determining whether he has a liberty interest in his relationship with his child. To do otherwise is to allow the State's interest in terminating the relationship to play a role in defining the "liberty" that is protected by the Constitution. According to our established framework under the Due Process Clause, however, we first ask whether the person claiming constitutional protection has an interest that the Constitution recognizes; if we find that he or she does, we next consider the State's interest in limiting the extent of the procedures that will attend the deprivation of that interest. See, *e. g.*, *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 428 (1982). By stressing the need to preserve the "unitary

family" and by focusing not just on the relationship between Michael and Victoria but on their "situation" as well, *ante*, at 124, today's plurality opinion takes both of these steps at once.

The plurality's premature consideration of California's interests is evident from its careful limitation of its holding to those cases in which "the mother is, at the time of the child's conception and birth, married to, and cohabitating with, another man, *both of whom wish to raise the child as the offspring of their union.*" *Ante*, at 129 (emphasis added). See also *ante*, at 127 (describing Michael's liberty interest as the "substantive parental rights [of] the natural father of a child conceived within, and born into, an *extant marital union that wishes to embrace the child*"). The highlighted language suggests that if Carole or Gerald alone wished to raise Victoria, or if both were dead and the State wished to raise her, Michael and Victoria might be found to have a liberty interest in their relationship with each other.[4] But that would be to say that whether Michael and Victoria have a liberty interest varies with the State's interest in recognizing that interest, for it is the State's interest in protecting the marital family — and not Michael and Victoria's interest in their relationship with each other — that varies with the status of Carole and Gerald's relationship. It is a bad day for due process when

---

[4] Note that the plurality presumably would disapprove the California courts' holdings in *Vincent B.* v. *Joan R.*, 126 Cal. App. 3d 619, 179 Cal. Rptr. 9 (1981) (§ 621 defeated putative father's interest even where husband and wife divorced at the time of the paternity action), and *Michelle W.* v. *Ronald W.*, 39 Cal. 3d 354, 703 P. 2d 88 (1985) (§ 621 defeated putative father's interest even where mother had married putative father and divorced man to whom she had been married at time of conception and birth). To suggest, moreover, that "it is at least possible that our traditions lead to a different conclusion" in cases such as *Vincent B.* and *Michelle W.*, *ante*, at 129, n. 7, is to express an optimism about our ability to identify "traditions" with microscopic precision that I do not share, and a willingness to slice society up into minuscule pieces, based only on tradition, that I cannot endorse.

the State's interest in terminating a parent-child relationship is reason to conclude that that relationship is not part of the "liberty" protected by the Fourteenth Amendment.

The plurality has wedged itself between a rock and a hard place. If it limits its holding to those situations in which a wife and husband wish to raise the child together, then it necessarily takes the State's interest into account in defining "liberty"; yet if it extends that approach to circumstances in which the marital union already has been dissolved, then it may no longer rely on the State's asserted interest in protecting the "unitary family" in denying that Michael and Victoria have been deprived of liberty.

The plurality's confusion about the proper analysis of claims involving procedural due process also becomes obvious when one examines the plurality's shift in emphasis from the putative father's standing to his ability to obtain parental prerogatives. See *ante*, at 126. In announcing that what matters is not the father's ability to claim paternity, but his ability to obtain "substantive parental rights," *ante*, at 127, the plurality turns procedural due process upside down. Michael's challenge in this Court does not depend on his ability ultimately to obtain visitation rights; it would be strange indeed if, before one could be granted a hearing, one were required to prove that one would prevail on the merits. The point of procedural due process is to give the litigant a fair chance at prevailing, not to ensure a particular substantive outcome. Nor does Michael's challenge depend on the success of fathers like him in obtaining parental rights in past cases; procedural due process is, by and large, an individual guarantee, not one that should depend on the success or failure of prior cases having little or nothing to do with the claimant's own suit.[5]

---

[5] One need only look as far as *Quilloin* v. *Walcott*, 434 U. S. 246, 255 (1978), to understand why an unwed father might lose for reasons having nothing to do with his own relationship with the child: there, we approved the use of a "best interest" standard, rather than an "unfitness" standard,

148

## III

Because the plurality decides that Michael and Victoria have no liberty interest in their relationship with each other, it need consider neither the effect of § 621 on their relationship nor the State's interest in bringing about that effect. It is obvious, however, that the effect of § 621 is to terminate the relationship between Michael and Victoria before affording any hearing whatsoever on the issue whether Michael is Victoria's father. This refusal to hold a hearing is properly analyzed under our procedural due process cases, which instruct us to consider the State's interest in curtailing the procedures accompanying the termination of a constitutionally protected interest. California's interest, minute in comparison with a father's interest in his relationship with his child, cannot justify its refusal to hear Michael out on his claim that he is Victoria's father.

### A

We must first understand the nature of the challenged statute: it is a law that stubbornly insists that Gerald is Victoria's father, in the face of evidence showing a 98 percent probability that her father is Michael.[6] What Michael wants is a chance to show that he is Victoria's father. By depriving him of this opportunity, California prevents Michael from taking advantage of the best-interest standard embodied in § 4601 of California's Civil Code, which directs that *parents* be given visitation rights unless "the visitation would be detrimental to the best interests of the child." Cal. Civ. Code Ann. § 4601 (West Supp. 1989).[7]

---

for an unwed father who objected to the adoption of his child by another man.

[6] JUSTICE STEVENS' claim that "Michael was given a fair opportunity to show that he is Victoria's natural father," *ante*, at 135, ignores the fact that this case is before us precisely because California law refuses to allow men like Michael such an opportunity.

[7] Showing a startling misunderstanding of the stakes in this case, the plurality characterizes the issue at the hearing that Michael seeks as

As interpreted by the California courts, however, § 621 not only deprives Michael of the benefits of the best-interest standard; it also deprives him of any chance of maintaining his relationship with the child he claims to be his own. When, as a result of § 621, a putative father may not establish his paternity, neither may he obtain discretionary visitation rights as a "nonparent" under § 4601. See *Vincent B.* v. *Joan R.*, 126 Cal. App. 3d 619, 627–628, 179 Cal. Rptr. 9, 13 (1981), appeal dism'd, 459 U. S. 807 (1982); see also *ante*, at 116. JUSTICE STEVENS' assertion to the contrary, *ante*, at 134–135, is mere wishful thinking. In concluding that the California courts afford putative fathers like Michael a meaningful opportunity to show that visitation rights would be in the best interests of their children, he fastens upon the words "in the circumstances of this case" in *Vincent B.* v. *Joan R.*, *supra*, at 627, 179 Cal. Rptr., at 13. *Ante*, at 134–135. His suggestion is that the court in that case conducted an individualized assessment of the effect on the child of granting visitation rights to Vincent B.

---

"whether, in the particular circumstances of his case, California's policies would best be served by giving him parental rights." *Ante*, at 120. The hearing that the plurality describes is merely one that the California courts hold in response to constitutional challenges such as those lodged here, see, *e. g.*, *Michelle W.* v. *Ronald W.*, 39 Cal. 3d, at 363, 703 P. 2d, at 93; it is not the hearing that Michael seeks as the end result of this lawsuit. The plurality's confusion is further evident in its announcement that "what is at issue here is *not* entitlement to a state pronouncement that Victoria was begotten by Michael." *Ante*, at 126 (emphasis added). That is precisely what is at issue in the hearing that Michael seeks.

JUSTICE STEVENS exhibits the same misunderstanding in pointing to *Michelle W.* and *In re Lisa R.*, 13 Cal. 3d 636, 532 P. 2d 123 (1975), as evidence of "the California courts' willingness to decide § 621 cases on a case-by-case basis." *Ante*, at 135, n. This "case-by-case" analysis is not the result of a flexible interpretation of § 621, but is the courts' response to the many constitutional challenges brought against § 621. Similarly, Michael was given an opportunity to show that "he had developed a relationship with [Victoria]," *ante*, at 135, only because he launched this constitutional attack on § 621.

The California appellate court's decision will not support JUSTICE STEVENS' reading, as the court's reasoning applies to *all* putative fathers whom § 621 has denied the opportunity to show paternity. The court in *Vincent B.* began by stressing the fact that the child's mother objected to visits from Vincent. This circumstance is present in every single case falling under the conclusive presumption of § 621. Granting visitation rights to a person who claimed to be the child's father, the court went on, also would cause "confusion, uncertainty, and embarrassment." 126 Cal. App. 3d, at 628, 179 Cal. Rptr., at 13. Again, the notion that unacceptable confusion would result from awarding visitation to a person who claims to be the child's father is equally applicable to any case in which the "nonparent" under § 4601 has lost under § 621. Finally, the court in *Vincent B.* approvingly cited *Petitioner F.* v. *Respondent R.*, 430 A. 2d 1075, 1080 (1981), in which the Supreme Court of Delaware rejected a putative father's argument that Delaware's conclusive presumption of paternity violated the Equal Protection Clause of the Federal Constitution. 126 Cal. App. 3d, at 627, 179 Cal. Rptr., at 13. Emphasizing the "permanent stigma and distress" that would result from granting parental rights to a putative father whose child was born to the wife of another man, the Delaware court decided that, given the State's interest in "guard-[ing] against assaults upon the family unit[,] . . . [t]he application of the presumption of legitimacy of a child born to a married woman would be in the child's interest *in practically all cases.*" 430 A. 2d, at 1080 (emphasis added). *Vincent B.*'s reliance on *Petitioner F.* sends a clear signal that the California court was issuing a ruling applicable to any case that fit into § 621's conclusive presumption, and that the "rough justice" that prevailed under § 621 also would suffice under § 4601. This kind of determination is a far cry from the individualized assessment that JUSTICE STEVENS would seem to demand. *Ante,* at 135.ˢ

---

ˢJUSTICE STEVENS incorrectly suggests that the court in *Vincent B.* based its denial of visitation rights under § 4601 partly on the lack of an

Likewise, in the case before us, the court's finding that "the existence of two (2) 'fathers' as male authority figures will confuse the child and be counter-productive to her best interests," Supp. App. to Juris. Statement A–90—A–91, is not an evaluation of the relationship between Michael and Victoria, but a restatement of the policies underlying § 621 itself. It may well be that the California courts' interpretation of § 4601 as precluding visitation rights for a putative father is "an unnatural reading" of that provision, *ante,* at 134, but it is not for us to decide what California's statute means.

Section 621 as construed by the California courts thus cuts off the relationship between Michael and Victoria—a liberty interest protected by the Due Process Clause—without affording the least bit of process. This case, in other words, involves a conclusive presumption that is used to terminate a constitutionally protected interest—the kind of rule that our preoccupation with procedural fairness has caused us to condemn. See, *e. g., Vlandis* v. *Kline,* 412 U. S. 441 (1973); *Cleveland Board of Education* v. *LaFleur,* 414 U. S. 632 (1974); *Weinberger* v. *Salfi,* 422 U. S. 749, 770–772 (1975).

Gerald D. and the plurality turn a blind eye to the true nature of § 621 by protesting that, instead of being a conclusive presumption, it is a "substantive rule of law." *Ante,* at 119. This facile observation cannot save § 621. It may be that all conclusive presumptions are, in a sense, substantive rules of law; but § 621 then belongs in that special category of substantive rules that presumes a fact relevant to a certain class of litigation, and it is that feature that renders § 621 suspect under our prior cases. To put the point differently, a conclusive presumption takes the form of "no X's are Y's," and is typically accompanied by a rule such as, ". . . and only Y's may obtain a driver's license." (There would be no need for the presumption unless something hinged on the fact pre-

established relationship between Vincent B. and the child. *Ante,* at 135. In fact, the court did not even mention the specific relationship between these two people in coming to its decision under § 4601. See 126 Cal. App. 3d, at 628, 179 Cal. Rptr., at 13.

sumed.) Ignoring the fact that § 621 takes the form of "no X's are Y's," Gerald D. and the plurality fix upon the rule following § 621 — only Y's may assert parental rights — and call § 621 a substantive rule of law. This strategy ignores both the form and the effect of § 621.

In a further effort to show that § 621 is not a conclusive presumption, Gerald D. claims — and the plurality agrees, see *ante*, at 119—that whether a man is the biological father of a child whose family situation places the putative father within § 621 is simply irrelevant to the State. Brief for Appellee 14. This is, I surmise, an attempt to avoid the implications of our cases condemning the presumption of a fact that a State has made relevant or decisive to a particular decision. See, *e. g.*, *Bell* v. *Burson*, 402 U. S. 535 (1971). Yet the claim that California does not care about factual paternity is patently false. California cares very much about factual paternity when the husband is impotent or sterile, see Cal. Evid. Code Ann. § 621(a) (West Supp. 1989); it cares very much about it when the wife and husband do not share the same home, see *Vincent B.* v. *Joan R.*, 126 Cal. App. 3d, at 623–624, 179 Cal. Rptr., at 11; and it cares very much about it when the husband himself declares that he is not the father, see Cal. Evid. Code Ann. § 621(c) (West Supp. 1989). Indeed, under California law as currently structured, paternity is decisive in choosing the standard that will be used in granting or denying custody or visitation. The State, though selective in its concern for factual paternity, certainly is not *indifferent* to it.[9] More fundamentally, California's purported indifference to factual paternity does not show that § 621 is not a conclu-

---

[9] In this respect, the plurality is mistaken in suggesting that "there is no difference between a rule which says that the marital husband shall be irrebuttably presumed to be the father, and a rule which says that the adulterous natural father shall not be recognized as the legal father." *Ante*, at 120. In the latter case, the State has not made paternity the predominant concern in child-custody disputes and then told some putative fathers that they may not prove their paternity.

sive presumption. To say that California does not care about factual paternity in the limited circumstances of this case—where the husband is neither impotent nor sterile nor living apart from his wife—is simply another way of describing its conclusive presumption.

Not content to rest on its assertion that § 621 does not, in fact, establish a conclusive presumption, the plurality goes on to argue that a challenge to a conclusive presumption must rest on substantive rather than procedural due process. See *ante*, at 120–121. This is simply not so. In *Weinberger* v. *Salfi, supra,* the Court identified two lines of cases involving challenges to social-welfare legislation: those in which a legislative classification was challenged as arbitrary and those in which a conclusive presumption was attacked. The Court fit the complaint in *Salfi* into the former category on the ground that the challenged law did not deprive anyone of a constitutionally protected interest. 422 U. S., at 772. Today's plurality, in contrast, classifies this case as one invoking substantive due process *before* it considers the nature of the interest at stake. Its support for this innovation includes several law-review commentaries, two concurrences in the judgment, a dissent, and *Salfi* itself. *Ante,* at 120–121. Even more disturbing than the plurality's reliance on these infirm foundations is its failure to recognize that the defect from which conclusive presumptions suffer is a *procedural* one: the State has declared a certain fact relevant, indeed controlling, yet has denied a particular class of litigants a hearing to establish that fact. This is precisely the kind of flaw that procedural due process is designed to correct.[10]

---

[10] We recognized as much in *Caban* v. *Mohammed,* 441 U. S. 380, 385, n. 3 (1979), in which we explicitly described *Stanley* v. *Illinois,* 405 U. S. 645 (1972), as a case involving *procedural* due process. The plurality's bald statement that the holding in *Stanley* did not rely on procedural due process is therefore incorrect. See *ante,* at 120.

## B

The question before us, therefore, is whether California has an interest so powerful that it justifies granting Michael *no* hearing before terminating his parental rights.

"Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950). When a State seeks to limit the procedures that will attend the deprivation of a constitutionally protected interest, it is only the State's interest in streamlining procedures that is relevant. See, *e. g., Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976). A State may not, in other words, justify abbreviated procedures on the ground that it wishes to pay welfare benefits to fewer people or wants to reduce the number of tenured professors on its payroll. It would be strange indeed if a State could curtail procedures with the explanation that it was hostile to the underlying, constitutionally protected interest.

The purported state interests here, however, stem primarily from the State's antagonism to Michael's and Victoria's constitutionally protected interest in their relationship with each other and not from any desire to streamline procedures. Gerald D. explains that § 621 promotes marriage, maintains the relationship between the child and presumed father, and protects the integrity and privacy of the matrimonial family. Brief for Appellee 24. It is not, however, § 621, but the best-interest principle, that protects a stable marital relationship and maintains the relationship between the child and presumed father. These interests are implicated by the determination of who gets parental rights, *not* by the determination of who is the father; in the hearing that Michael seeks, parental rights are not the issue. Of the objectives that Gerald stresses, therefore, only the preservation of fam-

ily privacy is promoted by the refusal to hold a hearing itself. Yet § 621 furthers even this objective only partially.

Gerald D. gives generous proportions to the privacy protected by § 621, asserting that this provision protects a couple like Gerald and Carole from answering questions on such matters as "their sexual habits and practices with each other and outside their marriage, their finances, and their thoughts, beliefs, and opinions concerning their relationship with each other and with Victoria." *Id.*, at 25. Yet invalidation of § 621 would not, as Gerald suggests, subject Gerald and Carole to public scrutiny of all of these private matters. Family finances and family dynamics are relevant, not to paternity, but to the best interests of the child—and the child's best interests are not, as I have stressed, in issue at the hearing that Michael seeks. The only private matter touching on the paternity presumed by § 621 is the married couple's sex life. Even there, § 621 as interpreted by California's intermediate appellate courts pre-empts inquiry into a couple's sexual relations, since "cohabitation" consists simply of living under the same roof together; the wife and husband need not even share the same bed. See, *e. g., Vincent B.* v. *Joan R.,* 126 Cal. App. 3d 619, 179 Cal. Rptr. 9 (1981). Admittedly, § 621 does not foreclose inquiry into the husband's fertility or virility—matters that are ordinarily thought of as the couple's private business. In this day and age, however, proving paternity by asking intimate and detailed questions about a couple's relationship would be decidedly anachronistic. Who on earth would choose this method of establishing fatherhood when blood tests prove it with far more certainty and far less fuss? The State's purported interest in protecting matrimonial privacy thus does not measure up to Michael's and Victoria's interest in maintaining their relationship with each other.[11]

---

[11] Thus, in concluding that § 621 "exclud[es] inquiries into the child's paternity that would be destructive of family integrity and privacy," *ante,* at 120, the plurality exaggerates the extent to which these interests would be threatened by the elimination of § 621's presumption. On the other hand,

Make no mistake: to say that the State must provide Michael with a hearing to prove his paternity is not to express any opinion of the ultimate state of affairs between Michael and Victoria and Carole and Gerald. In order to change the current situation among these people, Michael first must convince a court that he is Victoria's father, and even if he is able to do this, he will be denied visitation rights if that would be in Victoria's best interests. See Cal. Civ. Code Ann. § 4601 (West Supp. 1989). It is elementary that a determination that a State must afford procedures before it terminates a given right is not a prediction about the end result of those procedures.[12]

## IV

The atmosphere surrounding today's decision is one of make-believe. Beginning with the suggestion that the situa-

---

if the State's foremost interest is in protecting the husband from discovering that he may not be the father of his wife's children, as the plurality suggests, see *ante*, at 120, n. 1, then § 621 is unhelpful indeed. Since "cohabitation" under California law includes sharing the same roof but not the same bed and since a person need only make a phone call in order to unsettle a husband's certainty in the paternity of his wife's children, § 621 will do little to prevent such discoveries. See also *post*, at 162 (WHITE, J., dissenting).

[12] The plurality's failure to see this point causes it to misstate Michael's claim in the following way: "Michael contends as a matter of substantive due process that, because he has established a parental relationship with Victoria, protection of Gerald's and Carole's marital union is an insufficient state interest to support termination of that relationship." *Ante*, at 121. Michael does not claim that the State may not, under any circumstance, terminate his relationship with Victoria; instead, he simply claims that the State may not do so without affording him a hearing on the issue—paternity—that it deems vital to the question whether their relationship may be discontinued. The plurality makes Michael's claim easier to knock down by turning it into such a big target.

The plurality's misunderstanding of Michael's claim also leads to its assertion that "to *provide* protection to an adulterous natural father is to *deny* protection to a marital father." *Ante*, at 130. To allow Michael a chance to prove his paternity, however, in no way guarantees that Gerald's relationship with Victoria will be changed.

tion confronting us here does not repeat itself every day in every corner of the country, *ante*, at 113, moving on to the claim that it is tradition alone that supplies the details of the liberty that the Constitution protects, and passing finally to the notion that the Court always has recognized a cramped vision of "the family," today's decision lets stand California's pronouncement that Michael—whom blood tests show to a 98 percent probability to be Victoria's father—is not Victoria's father. When and if the Court awakes to reality, it will find a world very different from the one it expects.

JUSTICE WHITE, with whom JUSTICE BRENNAN joins, dissenting.

California law, as the plurality describes it, *ante*, at 119, tells us that, except in limited circumstances, California declares it to be *"irrelevant* for paternity purposes whether a child conceived during, and born into, an existing marriage was begotten by someone other than the husband" (emphasis in original). This I do not accept, for the fact that Michael H. is the biological father of Victoria is to me highly relevant to whether he has rights, as a father or otherwise, with respect to the child. Because I believe that Michael H. has a liberty interest that cannot be denied without due process of the law, I must dissent.

I

Like JUSTICES BRENNAN, MARSHALL, BLACKMUN, and STEVENS, I do not agree with the plurality opinion's conclusion that a natural father can never "have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth." *Ante*, at 133 (STEVENS, J., concurring in judgment). Prior cases here have recognized the liberty interest of a father in his relationship with his child. In none of these cases did we indicate that the father's rights were dependent on the marital status of the mother or biological father. The basic principle enun-

ciated in the Court's unwed father cases is that an unwed father who has demonstrated a sufficient commitment to his paternity by way of personal, financial, or custodial responsibilities has a protected liberty interest in a relationship with his child.[1]

We have not before faced the question of a biological father's relationship with his child when the child was born while the mother was married to another man. On several occasions however, we have considered whether a biological father has a constitutionally cognizable interest in an opportunity to establish paternity. *Stanley* v. *Illinois*, 405 U. S. 645 (1972), recognized the biological father's right to a legal relationship with his illegitimate child, holding that the Due Process Clause of the Fourteenth Amendment entitled the biological father to a hearing on his fitness before his illegitimate children could be removed from his custody. We rejected the State's treatment of Stanley "not as a parent but as a stranger to his children." *Id.*, at 648.

*Quilloin* v. *Walcott*, 434 U. S. 246, 255 (1978), also expressly recognized due process rights in the biological father, even while holding that those rights were not impermissibly burdened by the State's application of a "best interests of the child" standard. *Caban* v. *Mohammed*, 441 U. S. 380

---

[1] *Lehr* v. *Robertson*, 463 U. S. 248, 259–260 (1983), emphasized the distinction between "a mere biological relationship and an actual relationship of parental responsibility." In the dissent to *Lehr*, I said: "As Jessica's biological father, Lehr either had an interest protected by the Constitution or he did not. If the entry of the adoption order in this case deprived Lehr of a constitutionally protected interest, he is entitled to notice and an opportunity to be heard before the order can be accorded finality." *Id.*, at 268 (footnote omitted). I rejected the majority's approach which purported to analyze the particular facts of the case in order to determine whether Mr. Lehr had a constitutionally protected liberty interest. I stressed the interest that a natural parent has in his child, "one that has long been recognized and accorded constitutional protection." *Id.*, at 270. Whether or not the majority in *Lehr* was in error, on the facts of the instant case, even *Lehr*'s more demanding standard is clearly satisfied.

(1979), invalidated on equal protection grounds a statute under which a man's children could be adopted by their natural mother and her husband without the natural father's consent.

In *Lehr* v. *Robertson*, 463 U. S. 248, 261–262 (1983), though holding against the father in that case, the Court said clearly that fathers who have participated in raising their illegitimate children and have developed a relationship with them have constitutionally protected parental rights. Indeed, the Court in *Lehr* suggested that States must provide a biological father of an illegitimate child the means by which he may establish his paternity so that he may have the opportunity to develop a relationship with his child. The Court upheld a stepparent adoption over the natural father's objections, but acknowledged that "the existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child." *Id.*, at 266–267. There, however, the father had never established a custodial, personal, or financial relationship with his child. Lehr had never lived with the child or the child's mother after the birth of the child and had never provided any financial support.

In the case now before us, Michael H. is not a father unwilling to assume his responsibilities as a parent. To the contrary, he is a father who has asserted his interests in raising and providing for his child since the very time of the child's birth. In contrast to the father in *Lehr*, Michael had begun to develop a relationship with his daughter. There is no dispute on this point. Michael contributed to the child's support. Michael and Victoria lived together (albeit intermittently, given Carole's itinerant lifestyle). There is a personal and emotional relationship between Michael and Victoria, who grew up calling him "Daddy." Michael held Victoria out as his daughter and contributed to the child's financial support. (Even appellee concedes that Michael has "made greater efforts and had more success in establishing a

father-child relationship" than did Mr. Lehr. Brief for Appellee 13, n. 6.) The mother has never denied, and indeed has admitted, that Michael is Victoria's father.[2] *Lehr* was predicated on the absence of a substantial relationship between the man and the child and emphasized the "difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban*, and the potential relationship involved in *Quilloin* and *[Lehr]*." *Lehr, supra*, at 261. "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' *Caban, supra*, at 392, his interest in personal contact with his child acquires substantial protection under the Due Process Clause." *Lehr, supra*, at 261. The facts in this case satisfy the *Lehr* criteria, which focused on the relationship between father and child, not on the relationship between father and mother. Under *Lehr* a "mere biological relationship" is not enough, but in light of Carole's vicissitudes, what more could Michael have done? It is clear enough that Michael more than meets the mark in establishing the constitutionally protected liberty interest discussed in *Lehr* and recognized in *Stanley* v. *Illinois, supra*, and *Caban* v. *Mohammed, supra*. He therefore has a liberty interest entitled to protection under the Due Process Clause of the Fourteenth Amendment.

## II

California plainly denies Michael this protection, by refusing him the opportunity to rebut the State's presumption that the mother's husband is the father of the child. California law not only deprives Michael of a legal parent-child relationship with his daughter Victoria but even denies him the opportunity to introduce blood-test evidence to rebut the de-

---

[2] As the plurality concedes, Carole signed a stipulation in April 1984 acknowledging that Michael was Victoria's father. *Ante*, at 114–115.

monstrable fiction that Gerald is Victoria's father.[3]   Unlike *Lehr*, Michael has not been denied notice.   He has, most definitely, however, been denied any real opportunity to be heard.   The grant of summary judgment against Michael was based on the conclusive presumption of Cal. Evid. Code Ann. § 621 (West Supp. 1989), which denied him the opportunity to prove that he is Victoria's biological father.   The Court gives its blessing to § 621 by relying on the State's asserted interests in the integrity of the family (defined as Carole and Gerald) and in protecting Victoria from the stigma of illegitimacy and by balancing away Michael's interest in establishing that he is the father of the child.

The interest in protecting a child from the social stigma of illegitimacy lacks any real connection to the facts of a case where a father is seeking to establish, rather than repudiate, paternity.   The "stigma of illegitimacy" argument harks back to ancient common law when there were no blood tests to ascertain that the husband could not "by the laws of nature" be the child's father.   Judicial process refused to declare that a child born in wedlock was illegitimate unless the proof was positive.   The only such proof was physical absence or impotency.   But we have now clearly recognized the use of blood tests as an authoritative means of evaluating allegations of paternity.   See, *e. g.*, *Little* v. *Streater*, 452 U. S. 1, 6–7 (1981).   I see no reason to debate the plurality's multilingual explorations into "spousal nonaccess" and ancient policy concerns behind bastardy laws.   It may be true that a child conceived in an extramarital relationship would

---

[3] While the ultimate resolution of Michael's case, were he permitted to introduce such evidence, might well be visitation rights or even custody of the child, it is important to keep in mind that the question at issue here is not whether he should be granted visitation or custody but simply whether he can take the first step in any such proceeding.   Whatever the end result, Michael is simply asking that he be permitted to offer proof that he is Victoria's father.   In the instant case, that is likely to mean that he would introduce the blood tests that he and Carole took and which show that Michael is Victoria's father.

be considered a "bastard" in the literal sense of the word, but whatever stigma remains in today's society is far less compelling in the context of a child of a married mother, especially when there is a father asserting paternity and seeking a relationship with his child. It is hardly rare in this world of divorce and remarriage for a child to live with the "father" to whom her mother is married, and still have a relationship with her biological father.

The State's professed interest in the preservation of the existing marital unit is a more significant concern. To be sure, the intrusion of an outsider asserting that he is the father of a child whom the husband believes to be his own would be disruptive to say the least. On the facts of this case, however, Gerald was well aware of the liaison between Carole and Michael. The conclusive presumption of evidentiary rule § 621 virtually eliminates the putative father's chances of succeeding in his effort to establish paternity, but it by no means prevents him from asserting the claim. It may serve as a deterrent to such claims but does not eliminate the threat. Further, the argument that the conclusive presumption preserved the sanctity of the marital unit had more sway in a time when the husband was similarly prevented from challenging paternity.[4]

---

[4] Even in the last quarter century, under California law, a husband whose blood test definitively showed he could not be the father of the child born to his wife was nonetheless not permitted to present this evidence to a court in order to refute the conclusive presumption of paternity. In 1967, however, the California courts began to erode the presumption as it applied to the husband, providing the husband with at least some opportunity to demonstrate that he was not the child's father. *Jackson* v. *Jackson*, 67 Cal. 2d 245, 430 P. 2d 289 (1967). In 1980, the California Legislature amended § 621 of its Evidence Code in order to permit the husband an opportunity to overcome the presumption that he is the father of his wife's child if he raises the notice of motion for blood tests not later than two years from the birth of the child. (So much for the State's interest in protecting the child from the stigma of illegitimacy!)

"The emphasis of the Due Process Clause is on 'process.'" *Moore* v. *East Cleveland*, 431 U. S. 494, 542 (1977) (WHITE, J., dissenting). I fail to see the fairness in the process established by the State of California and endorsed by the Court today. Michael has evidence which demonstrates that he is the father of young Victoria. Yet he is blocked by the State from presenting that evidence to a court. As a result, he is foreclosed from establishing his paternity and is ultimately precluded, by the State, from developing a relationship with his child. "A fundamental requirement of due process is 'the opportunity to be heard.' *Grannis* v. *Ordean*, 234 U. S. 385, 394. It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965). I fail to see how Michael was granted any meaningful opportunity to be heard when he was precluded at the very outset from introducing evidence which would support his assertion of paternity. Michael has never been afforded an opportunity to present his case in any meaningful manner.

As the Court has said: "The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." *Lehr*, 463 U. S., at 262. It is as if this passage was addressed to Michael. Yet the plurality today recants. Michael eagerly grasped the opportunity to have a relationship with his daughter (he lived with her; he declared her to be his child; he provided financial support for her) and still, with today's opinion, his opportunity has vanished. He has been rendered a stranger to his child.

Because Cal. Evid. Code Ann. § 621, as applied, should be held unconstitutional under the Due Process Clause of the Fourteenth Amendment, I respectfully dissent.