Marvin HENDERSON, Appellant,

v.

Karen Lou WIETZIKOSKI, Appellee.

No. 10–91–173–CV.

Court of Appeals of Texas,
Waco.

Oct. 30, 1992.

Cecilia M. Wood, Austin, for appellant.

Holloway Martin, Martin and Thomas, Mexia, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

The question presented is whether a person claiming to be the natural father of a child who has a "presumed father" can maintain a suit to establish his paternity. We will follow the decision of the Beaumont Court of Appeals in holding that section 11.03(a)(7) of the Family Code violates the due-course-of-law clause of article I, section 19, of the Texas Constitution. *See* TEX. CONST. art. I, § 19; TEX.FAM.CODE ANN. § 11.03(a)(7) (Vernon Supp.1992); *Gibson v. In the Interest of J.W.T.*, 815 S.W.2d 863, 869 (Tex.App.—Beaumont 1991, writ granted). We also determine that section 11.03(a)(7) of the Family Code violates the Texas Equal Rights Amendment, article I, section 3a, of the Texas Constitution, but does not violate the Open Courts provision of article I, section 13. *See* TEX. CONST. art. I, §§ 3a, 13. Accordingly, we will reverse the judgment and remand the cause for trial.

## PROCEDURAL BACKGROUND

Marvin Henderson filed a petition to establish a parent-child relationship alleging among other things that: (1) he is the biological father of J.R.W. and has standing to bring the suit under section 11.03(a)(7) of the Family Code; (2) he has standing under section 11.03(b) of the Family Code because of substantial past contact with the child; (3) the "presumed father of the child is Kenneth Wietzikoski, the husband of Karen Wietzikoski," the child's mother; (4) he is a "presumed father pursuant to [section] 12.02 of the Texas Family Code"; (5) because of section 12.01(b) of the Family Code, the legal presumption that Kenneth is the father of J.R.W. may be rebutted by a decree establishing Henderson's paternity of J.R.W.; (6) appointment of a managing conservator is necessary; and (7) a denial of his right to maintain the suit would violate his rights to due process under the state and federal constitutions. He also filed a "Statement of Paternity," in which he acknowledged that he is the biological father of J.R.W. Karen filed special exceptions alleging that

Henderson could not maintain the action because the child has a presumed father, Kenneth. She also denied that Henderson is the biological father of J.R.W., that a managing conservator is necessary, and that the best interest of the child would be served by appointing Henderson. The court sustained the special exceptions and ordered that all of Henderson's allegations of paternity be stricken from his pleadings but reserved a ruling on his allegations that he should be appointed as a managing conservator of J.R.W. The court then severed Henderson's cause of action regarding paternity from his cause of action seeking conservatorship of the child, making the order sustaining the special exceptions final. After his motion for a new trial was denied, Henderson perfected this appeal.

## THE CONTENTIONS ON APPEAL

Henderson asserts in five points that his right to bring the suit is constitutionally protected, that a denial of his right to maintain the suit violates the "open courts" provision of the state constitution, that the court's order granting the special exceptions misinterprets the Family Code, that the order "results in gross injustice and inequity and violates public policy," and that the court failed to consider the best interest of the child. Under point one, he asserts that section 11.03(a)(7) of the Family Code violates both the due-process and equality-under-the-law provisions of the Texas Bill of Rights.

## THE STATUTE

Section 11.03 of the Family Code provides:

§ 11.03 **Who May Bring Suit**

(a) An original suit affecting the parent-child relationship may be brought at any time by:

(1) a parent of the child;

(2) the child (through a representative authorized by the court);

. . . . .

(7) a man alleging himself to be the biological father *of a child who has no presumed father filing in accordance*

*with Chapter 13 of this code, but not otherwise;* .

TEX.FAM.CODE ANN. § 11.03 (emphasis added). In a 1989 amendment, the words "a man ... alleging himself to be the biological father of a child who has no presumed father" replaced the words "the alleged or probable father of an illegitimate child." Act of May 29, 1989, 71st Leg., R.S., ch. 375, § 2, 1989 Tex.Gen.Laws 1477, 1477–78.

## DUE COURSE OF LAW

■ The facts of this case are substantially the same as the facts of *Gibson.* *See Gibson,* 815 S.W.2d at 864–65. In each case, a man not married to the child's mother is attempting to establish a parent-child relationship with a child who has a presumed father. In each case, the man asserts that the provisions of the Family Code precluding such an action violate the due-course-of-law provision of the state constitution. In each case, the trial court has summarily denied the man the right to attempt to establish a parent-child relationship with the child. Consequently, we will follow the decision in *Gibson* holding that section 11.03(a)(7) of the Family Code violates article I, section 19, of the Constitution of the State of Texas. *See id.*

## TEXAS EQUAL RIGHTS AMENDMENT

■ Henderson asserts that section 11.03(a)(7) of the Family Code violates the Texas Equal Rights Amendment.[1] Since 1972, the Texas Constitution has guaranteed that equality shall not be denied because of sex. TEX. CONST. art. I, § 3a. Section 3a of article I provides:

> Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

*Id.* Because no federal counterpart of the Equal Rights Amendment exists, federal precedent cannot control. *In Interest of McLean,* 725 S.W.2d 696, 697 (Tex.1987).

Thus, our decision rests on independent state grounds under the Texas Constitution. *See Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983).

In assessing Henderson's equal-rights assertion, we will follow the analysis used by the Supreme Court in *McLean.* *See McLean,* 725 S.W.2d at 697–98. Billy Dean Wise was the undisputed father of a child born to an unwed mother. *Id.* at 696. Although married to another woman, he sought to be named managing conservator of the child after the mother placed the child for adoption. *Id.* The trial court denied Wise's suit for legitimation and appointed the Child Welfare Unit as managing conservator of the child. *Id.* On appeal, he contended that sections 13.21(b) and (c) of the Family Code violated the Texas Equal Rights Amendment. *Id.* at 697. The Supreme Court agreed, holding that a father seeking a decree of legitimation should not, when the mother has not consented to the decree, be required to prove that such a decree is in the best interest of the child—a higher standard of proof—solely because he is a male. *Id.* at 698.

The first step in a case invoking the Texas Equal Rights Amendment is to determine whether equality "under the law" has been denied. *Id.* at 697. Any discrimination that occurred in denying Henderson's suit to establish paternity is clearly "under the law" because it is mandated by a state statute. *See id.* Our next inquiry is whether equality was denied *because of* a person's membership in a protected class of sex, race, color, creed, or national origin. Our task is to examine the Family Code to see if it treats Henderson differently because he is a male. *See id.*

When a child is born, its mother automatically exercises all of the rights, duties, and privileges of a parent in the parent-child

---

1. This assertion was before the Beaumont court in *Gibson,* but was not addressed in the opinion. Nevertheless, the Supreme Court has granted a writ of error on points stating that the Court of Appeals erred in "not finding that the denial of standing did not constitute a violation of the state's open courts guarantee" and "not finding that the denial of standing did not constitute a violation of Article I, Section 3a of the Texas Constitution." *See In the Interest of J.W.T,* 35 Tex.Sup.Ct.J. 1007, 1008 (July 1, 1992).

relationship. TEX.FAM.CODE ANN. § 12.04 (Vernon Supp.1992); *McLean,* 725 S.W.2d at 697. Circumstances are different for the father of a child born to a woman who is married to someone else. Section 11.-03(a)(7) of the Family Code stands as a complete bar to such a father who nevertheless wants to step forward and shoulder the responsibilities of a parent. TEX.FAM. CODE ANN. § 11.03(a)(7). It does so by denying that father the right to bring a suit to establish his paternity. *Id.* The mother, however, can bring such a suit to establish that relationship. *Id.* § 11.03(a)(1). This is a gender-based distinction because only men such as Henderson and those who are similarly situated are denied the right to bring a suit to establish the parent-child relationship. Whereas *McLean* involved only a higher burden of proof, Henderson is confronted with a statute that denies him the right to even present proof. *See McLean,* 725 S.W.2d at 697.

Because the challenged statute discriminates on the basis of gender, we must determine whether such discrimination is prohibited by the Equal Rights Amendment. *See id.* The Equal Rights Amendment is more extensive and provides more specific protection than both the United States and Texas due-process and equal-protection guarantees. *Id.* at 698. The standard of review recognizes that the Amendment does not yield except to compelling state interests. *Id.* Equality based on sex is afforded maximum constitutional protection. *Id.* Even the loftiest goal does not justify sex-based discrimination in light of this clear constitutional prohibition. *Id.* Discrimination is allowed only when its proponent can prove that there is no other manner to protect the state's compelling interest. *Id.*

We recognize that the State has an interest in preserving the unity of a marriage. The State also has an interest in the welfare of children, an interest that it exercises by regulating the parent-child relationship and defining the rights, privileges, duties, and powers of parents.[2] TEX.FAM. CODE ANN. § 12.04. Under the circumstances of this case, these interests compete. Lord Mansfield's rule, proclaimed in 1777, declared as a policy that "a couple, after the birth of a child in wedlock, would not be heard to say that they have had no connection and their offspring is spurious." *Barnett v. Barnett,* 451 S.W.2d 939, 940 (Tex.Civ.App.—Beaumont 1970, writ dism'd) (quoting *Clark v. State of Maryland,* 208 Md. 316, 118 A.2d 366, 368 (1955)). Although criticized for two centuries, the rule survived because it found support in the difficulty of proving conclusively that a particular man was the father of a particular child. The alleged father might or might not admit paternity or even access. The mother might or might not make such admissions. The mother's husband might or might not claim non-access or paternity. Even if all parties told the truth, the circumstances might be such that a trier of fact would be left to guess about which man was the biological father. It is understandable that the courts would resist being called upon to adjudicate such controversies.

People of all ages are interested in knowing who their parents are. Adults, after being raised by adoptive parents, seek ways and means of ascertaining the identities of their biological parents in spite of the legal obstacles imposed through the adoption process. With advances in technology, independent scientific tests—such as blood typing and DNA testing—are available to the parties and to the courts to prove almost conclusively the biological relationship between a father and a child. Indeed, in *Gibson* the DNA tests showed a 99.41% probability that Gibson was the biological father. *Gibson,* 815 S.W.2d at 865. We believe that the State's interest in protecting the marriage relationship after a child is conceived by a man and a woman married to another is not as compelling as its demonstrated interest in promoting the

---

2. An example of the Legislature's policy concerning children is expressed in a 1985 child-support act: "Purpose: It is the purpose of this Act to promote the well-being of children through the timely fulfillment of parents' obligations to support their children." Act of May 27, 1985, 69th Leg., R.S., ch. 232, § 1, 1985 Tex.Gen.Laws 1158.

welfare of children by allowing paternity to be established through litigation when necessary. *See* Tex.Fam.Code Ann. §§ 13.01–13.44 (Vernon 1986 & Vernon Supp.1992). Thus, we believe that the goal of protecting marital harmony does not justify sex-based discrimination against fathers who desire to be recognized as a parent—the only biological parents denied that right—in light of the clear constitutional prohibition of the Texas Equal Rights Amendment. *Id.*

## "OPEN COURTS"

■ In point two, Henderson asserts that a denial of standing to an entire group or classification of individuals based solely on that classification violates the open courts doctrine. *See* Tex. Const. art. I, § 13. The essence of the due-process guarantee of section 13 of the Texas Constitution (usually called the "Open Courts" provision), when a legislative act is alleged to deny a citizen access to the courts, is: Does the litigant's right of redress outweigh the legislative basis for the ordinance and statute? *Sax v. Votteler*, 648 S.W.2d 661, 665 (Tex.1983). In *Sax*, the Supreme Court said that, in analyzing a litigant's right to redress, two criteria must be satisfied: "First, it must be shown that the litigant has a cognizable common-law cause of action that is being restricted. Second, the litigant must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute." *Id.* at 666. Because of Lord Mansfield's Rule, Henderson did not have a cognizable common-law cause of action that has been restricted by legislation. Thus, he cannot meet the first test of *Sax*. *See id.* at 665.

## CONCLUSION

We overrule point of error number two. However, we sustain point of error number one and reverse the judgment and remand the cause to the trial court for a trial on the merits of Henderson's suit to establish his paternity of J.R.W. Because of this disposition, we do not reach Henderson's remaining points.

THOMAS, C.J., concurs and dissents and files opinion.

THOMAS, Chief Justice, concurring and dissenting.

Section 11.03(a)(7) of the Family Code prohibits a man, who claims to be the biological father of a child with a presumed father, from bringing a suit to establish his parentage. Tex.Fam.Code Ann. § 11.03(a)(7) (Vernon Supp.1992). The majority holds that this provision does not violate the "open courts" provision of the Texas constitution but does violate both the due-course-of-law clause and the Equal Rights Amendment of our state's constitution. *See* Tex. Const. art. I, §§ 3a, 13, 19. My disagreement is not with the open-courts holding but with the finding of a due-process and equal-rights violation.

The majority adopts the decision of the Beaumont court of appeals in *Gibson v. J.W.T.*, 815 S.W.2d 863 (Tex.App.—Beaumont 1991, writ granted), as the basis for their due-course-of-law holding. This is unwise for several reasons. First, that decision improvidently ignores the test in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), a case directly on point, for determining whether the right asserted by the biological father is fundamental and thus entitled to due-process protection. Moreover, *Gibson* does not even apply the correct test for determining whether the provision violates the due-course-of-law clause. When the correct test is applied, however, the provision passes muster on due-process grounds. More importantly, the Beaumont court is apparently the first Texas court willing to declare that our society has recognized and traditionally protected the biological father's parenthood in derogation of the marital family's right to protect its offspring from outside claims of illegitimacy. That dubious distinction should remain theirs alone.

The majority uses *In Interest of McLean* as the basis for their equal-rights holding. *See In Interest of McLean*, 725 S.W.2d 696

(Tex.1987). They acknowledge that the Equal Rights Amendment must yield to a compelling interest of the state and that the state has a compelling interest in protecting the marital family and its children. Surely, those compelling interests extend to insulating the family from outside attack on the legitimacy of its children. The fatal flaw in the majority's equal-rights analysis is in not recognizing that there is simply no other way to advance these compelling interests other than by prohibiting any outsider from attacking the legitimacy of a child born to the family. Once an outside attack is permitted, the damage is irreparably done.

For these reasons, which I elaborate on below, I concur and respectfully dissent.

## DUE COURSE OF LAW

MICHAEL H. v. GERALD D.

At issue in *Michael H. v. Gerald D.* is a California statutory scheme so substantially similar to the Texas scheme as to be virtually identical in their effect. *Michael H.*, 491 U.S. at 121, 109 S.Ct. at 2341. In short, the California and Texas statutes each allow the husband and wife to question the paternity of a child born to their marriage but deny that right to the biological father. CAL.EVID.CODE ANN. § 621 (West Supp.1992); TEX.FAM.CODE ANN. §§ 11.03(a)(7), 12.06 (Vernon Supp.1992). The biological father in *Michael H.*, in *Gibson,* and here all raise the same federal constitutional attack: The state violates his procedural and substantive right to due process by preventing him from establishing his filial relationship with a child born to a marital family.

The Supreme Court used the traditional test for determining whether the California statute violated the biological father's due-process right—Is the "liberty" interest claiming protection "fundamental"? *Michael H.*, 491 U.S. at 121, 109 S.Ct. at 2341. Under this test, due-process protection extends only to rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* The Court, of course, recognizes that the federal constitution protects the sanctity of the *family*

because it is so deeply rooted in the nation's history and tradition. *Id.* 491 U.S. at 123, 109 S.Ct. at 2342. However, our society has traditionally protected the "unitary family"—the relationship typified by the "marital family"—as opposed to a unit consisting of a married woman, her lover, and their child. *Id.* at n. 3.

Because our society traditionally affords protection to the marital family against outside attack on the legitimacy of its offspring, the Court then narrowed the legal issue:

Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael [the biological father] and Victoria [the child] has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection. We think it impossible to find that it has. *In fact, quite to the contrary, our traditions have protected the marital family (Gerald, Carole, and the child they acknowledge to be theirs) against the sort of claim Michael asserts.*

*Id.* 491 U.S. at 124, 109 S.Ct. at 2342 (emphasis added). Consequently, the biological father's burden is to establish that the natural father's power to assert parental rights over a child born to the mother's existing marriage with another man is so deeply embedded within our traditions as to be fundamental. *Id.* 491 U.S. at 125, 109 S.Ct. at 2343.

Moreover, assuming that the biological father could establish that society has always protected the right of the natural father to establish his parentage at the expense of the marital family, he still could not prevail on his due-process claim. *Id.* "What Michael asserts here is a right to have himself declared the natural father *and thereby to obtain parental prerogatives." Id.* Thus, his burden is not only to show that the natural father has traditionally been accorded the right to sue to establish his parentage of a child born to a marital family, but that our society has "traditionally accorded such a father paren-

tal rights, or at least has not traditionally denied them." *Id.* 491 U.S. at 126, 109 S.Ct. at 2343–44.

What counts is whether the States in fact award substantive parental rights to the natural father of a child conceived within and born into an extant marital union that wishes to embrace the child.... We are not aware of a single case, old or new, that has done so. This is not the stuff of which fundamental rights qualifying as liberty interests are made.

*Id.* 491 U.S. at 127, 109 S.Ct. at 2344. Four other members of the Supreme Court joined Justice Scalia in using this narrow analytical test for evaluating the due-process claim of the biological father.

Unable to find a single decision recognizing and protecting the biological father's right to establish his parentage of a child born to a marital family and to gain the rights of fatherhood at the expense of the presumed father, the Supreme Court rejected the due-process claim and held that "[i]t is a question of legislative policy and not constitutional law whether California will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted." *Id.* 491 U.S. at 129–30, 109 S.Ct. at 2345. As the Court notes, "[i]t is no conceivable denial of constitutional right for a State to decline to declare facts [i.e., the biological father's parentage] unless some legal consequence hinges upon the requested declaration." *Id.* 491 U.S. at 126, 109 S.Ct. at 2343.

In rejecting the due-process claim, the Supreme Court's disposition left to the people of California—the legislative branch—the policy question of whether to provide protection to an adulterous natural father at the expense of the marital father or vice versa. *Id.* 491 U.S. at 129, 109 S.Ct. at 2345. The public-policy choice between competing rights is necessary because, as the Supreme Court notes, "California law, like nature itself, makes no provision for dual fatherhood." *Id.* 491 U.S. at 118, 109 S.Ct. at 2339.

GIBSON v. J.W.T.

The people of Texas, acting through their legislative branch, have decided the public-policy question the same as California: Texas denies protection to the biological father in preference to the marital father and the family. TEX.FAM.CODE ANN. § 11.-03(a)(7). Unlike the Supreme Court, which could find no fundamental right of a biological father to attack the legitimacy of children born to the marital family, the *Gibson* court discovers a constitutional basis for that claim in Texas' due-course-of-law provision. TEX. CONST. art. I, § 19; *Gibson*, 815 S.W.2d at 869. Section 11.03(a)(7) of the Texas Family Code is unconstitutional, the *Gibson* court says, because it sweeps too broadly when it requires the child to have no "presumed father" before a biological father can sue to establish his parentage. *Gibson*, 815 S.W.2d at 868. In the words of the Beaumont court, the Texas legislature can no longer "perpetuate the myth of 'presumption of paternity' so as to deprive the biological father of at least a chance of being able to exercise those rights, duties, privileges, and responsibilities that all civilized societies have recognized to be fundamentally ingrained in the concept of parenthood." *Id.* at 869.

As already noted, this gives Texas the dubious distinction—no doubt much to the surprise of our citizens and legislature—of being the only state ever to have a court declare that our society has traditionally protected the adulterous natural father's right to establish his parenthood and obtain parental rights in derogation of the right of the marital family to protect its offspring from claims of illegitimacy by outsiders. Certainly, the Supreme Court could find no such authority or tradition. *Michael H.*, 491 U.S. at 127, 109 S.Ct. at 2344. Not surprisingly, the Beaumont court offered not a whit of authority to support its view of our society's historical preferences.

Recognizing that the Supreme Court evaluated the biological father's due-process claim in the context of whether our society has traditionally accorded sanctity and protection to the marital family or to a unit composed of the married mother, the

child, and the biological father, the *Gibson* court rejected that test as an "obviously strained analysis." *Gibson*, 815 S.W.2d at 867. It chose instead to evaluate the biological father's state due-process claim in the context of whether our society has traditionally protected "parenthood," all the while claiming that it was adopting the "same method used when analyzing federal due-process complaints." *Id.* at 866.

Our state constitution does have an independent vitality and can serve as a fuller guarantee of citizens' rights. *Davenport v. Hon. Carolyn Garcia, Judge*, 834 S.W.2d 4 (1992); *LeCroy v. Hanlon*, 713 S.W.2d 335, 339 (Tex.1986). Moreover, I acknowledge that the *Gibson* court was not required to accept the mode of analysis used by the United States Supreme Court in interpreting the due-process claim asserted by the biological father in *Michael H. See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982). However, if the court was—as it professed to be—adopting the "same method used when analyzing federal due-process complaints," then it should have applied the narrower Scalia test. *Gibson*, 815 S.W.2d at 866. The distorted effect of using the broader, more indistinct, test of "parenthood" is discussed later.

In any event, after switching its focus from "family" to "parenthood," the *Gibson* court then holds that: (1) the rights and privileges of *parenthood* are fundamental because they have been accorded traditional protection by society; and (2) article I, section 19, of the Texas constitution protects the biological father's *parenthood* at the expense of the marital father's presumed fatherhood and of the marital family. *Id.* at 867, 869. Texas has indeed protected an individual's parenthood, but never at the expense of the legitimacy of children or the marital family.

"*Thank God,*" the court declares, "*the Fourteenth Amendment gives the federal government no power to impose upon this state its view of what constitutes wise economic or social policy.*" *Id.* at 867 (emphasis added). Unfortunately, after

thanking Providence that Texas can declare its own state policy, the *Gibson* court proceeds to ignore the policy set by the Texas legislature, which protects the marital family from outsiders attacking the legitimacy of children born to the marriage. TEX.FAM. CODE ANN. § 11.03(a)(7).

Moreover, after acknowledging "the state's compelling interest in preventing the delegitimation of offspring and maintaining the welfare and dignity of the traditional marital unit to the greatest extent possible," the court declares:

Because a husband chooses to forgive and forget the fact that his wife has been impregnated by another man, and the wife is happy with remaining married *and* at the same time giving birth to another man's child does not, we feel, give license to the state to perpetuate the myth of "presumption of paternity" so as to deprive the biological father of at least a chance of being able to exercise those rights, duties, privileges, and responsibilities that all civilized societies have recognized to be fundamentally ingrained in the concept of parenthood.

*Gibson*, 815 S.W.2d at 869.

Consider for a moment a logical extension of the holding in *Gibson*. A married woman bears a child as the result of being raped by an acquaintance of her husband. Knowing that the child is not his, her husband nevertheless lovingly accepts the child as his own. The public policy of the state, under section 12.02 of the Family Code, presumes that her husband is the child's father, and section 12.06 only allows the mother and the presumed father to question paternity. The biological father (the rapist) then asserts the right to establish his parentage and be awarded the rights of parenthood. Nature and the law provides for only one father. Whose parental rights are to be granted supremacy? The right of the biological father or the right of the presumed father? Like California, Texas has answered this public-policy question in favor of the presumed father and the peace and tranquility of the marital family.

No longer, according to the Beaumont court, can the legislature "perpetuate the myth of 'presumption of paternity' so as to deprive the biological father of at least a chance of being .able to exercise those rights, duties, privileges, and responsibilities that all civilized societies have recognized to be fundamentally ingrained in the concept of parenthood." *Id.* The *Gibson* court has made the choice for the people of Texas—the right of the biological father is paramount. His parenthood and his parental rights must be accorded supremacy over those of the presumed father because, apparently, Texas has traditionally and historically protected his rights in preference to those of the marital family. Under *Gibson,* the biological father prevails because, otherwise, the state violates his due-process right under the Texas constitution if it does not give him at least a chance of obtaining parental rights over the child. What result could be more abhorrent to the mores of our society? Yet, that is the logical extension of the *Gibson* holding.

What produces this bizarre result is the Beaumont court's rejection of the Scalia test, which concentrates on the narrow question of whether society traditionally protects the marital family from attacks of individuals claiming parenthood and seeking parental rights of children born to the marital family. Use of the more general and imprecise standard of "parenthood," rather than the narrow and particularized test prescribed in *Michael H.,* "permit[s] judges to dictate rather than discern the society's views.... Although assuredly having the virtue (if it be that) of leaving judges free to decide as they think best when the unanticipated occurs, a rule of law that binds neither by text nor by any particular, identifiable tradition, is no rule of law at all." *Michael H.,* 491 U.S. at 127 n. 6, 109 S.Ct. at 2344 n. 6.

Unfortunately, when the *Gibson* court could identify no ingrained tradition of our society to protect the right of the biological father in preference to that of the presumed father, it chose to meet the unanticipated equities of the moment by ignoring the public policy established by the people of Texas—the biological father's right is now to be preferred over those of the marital family. The legislature obviously made the wrong public-policy choice for the people of Texas, and the Beaumont court has rectified the error—no longer can the errant legislature "perpetuate the myth of 'presumption of paternity'." *Gibson,* 815 S.W.2d at 869. For the first time in the history of Texas jurisprudence, and in absolute derogation of the common law, a court recognizes the constitutional right of an outsider to attack the sanctity of the marital family by establishing the illegitimacy of its children. Surely that cannot be a right granted by the due-process clause of our state's constitution.

THIS CASE

The biological father in this case raises due-process claims under the state and federal constitutions. The United States Supreme Court has answered the federal question. *Michael H.,* 491 U.S. at 129, 109 S.Ct. at 2345. The *Gibson* court failed, however, to apply the accepted test for determining a due-process violation under the state constitution. A statute does not violate the substantive protection of the due-process clause of the Texas constitution if it (1) has a legitimate public purpose based on the promotion of the public welfare and (2) the means it employs to promote the public good have a reasonable and fair relationship to the objective to be attained. *Texas Woman's University v. Chayklintaste,* 530 S.W.2d 927, 928 (Tex. 1975); *City of University Park v. Benners,* 485 S.W.2d 773, 778 (Tex.1972). Thus, a court must evaluate and balance the gain to the public good resulting from the statute against the severity of its effect upon personal or property rights. TEX. CONST. art. I, § 19 (commentary). It violates substantive due process if the social necessity the statute advances does not justify the restriction of the liberty interest affected. *Id.*

The state's compelling interest "in preventing the delegitimation of offspring and maintaining the welfare and dignity of the traditional marital unit to the greatest extent possible" must be conceded, as did the *Gibson* court. *Gibson,* 815 S.W.2d at 868. The presumption of paternity of children

born to the marital family and their legitimacy—which the Beaumont court characterizes as a "myth" that can longer be perpetuated by the Texas Family Code—is a fundamental principle of the common law. *Michael H.*, 491 U.S. at 124, 109 S.Ct. at 2342. The common-law's restriction on the presumption's rebuttal advances two public-policy interests: (1) protecting the legitimacy of children and (2) promoting the peace and tranquility of the marital family. *Id.* 491 U.S. at 125, 109 S.Ct. at 2343. The Texas statutory scheme advances both of these interests by restricting the parties who can rebut the presumption to members of the marital family (mother and presumed father) and denying that right to outsiders. TEX.FAM.CODE ANN. §§ 11.03(a)(7), 12.06. This scheme protects children from being declared illegitimate by an attack from one outside the traditional family unit.

I would hold that the statutory scheme in the Family Code meets the traditional test for determining whether a statute violates the substantive protection of the due-process clause of the Texas constitution. It advances the public welfare by (1) protecting children's legitimacy and insulating the marital family from an outsider's attack on its most innocent and vulnerable members, and (2) does so by means of a presumption and a proscription that have a rational relationship to the societal ends sought to be attained. *Chayklintaste*, 530 S.W.2d at 928; *Benners*, 485 S.W.2d at 778; TEX. CONST. art. I, § 19 (commentary). Accordingly, I would reject the biological father's claim of due process and, as the Supreme Court did, leave to the people of Texas the policy question of whether a biological father should be allowed to rebut the presumption of legitimacy. *See Michael H.*, 491 U.S. at 129–30, 109 S.Ct. at 2345.

TEXAS EQUAL RIGHTS AMENDMENT

"Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin." TEX. CONST. art. I, § 3a. A three-step analysis determines whether this provision is violated. *In Interest of McLean*, 725 S.W.2d at 697–98. The first step is to determine whether equality *under the law* has been denied. *Id.* at 697. If it has, then step two is to determine whether equality was denied *because* of a person's membership in one of the protected classes. *Id.* A statute is discriminatory only if both of these inquiries are answered in the affirmative. *Id.* A final inquiry is to determine whether the state has an interest so compelling that it can be protected in no other way except by the discriminatory statute. *Id.* at 698. This third step is necessary because the Equal Rights Amendment will yield to a compelling state interest. *Id.*

Using *In Interest of McLean* as the basis for its analysis, the majority holds that section 11.03(a)(7) is discriminatory because it denies the biological father equality because of his sex. Although acknowledging that the state has a compelling interest in protecting the marital family and the interests of children, the majority nevertheless declares:

> We believe that the State's interest in protecting the marriage relationship after a child is conceived by a man and a woman married to another is not as compelling as its demonstrated interest in promoting the welfare of children by allowing paternity to be established through litigation when necessary. *See* TEX.FAM.CODE ANN. Chapter 13. Thus, we believe that the goal of protecting marital harmony does not justify sex-based discrimination against fathers who desire to be recognized as a parent—the only biological parents denied that right—in light of the clear constitutional prohibition of the Texas Equal Rights Amendment.

Two flaws in the majority's analysis become obvious upon an examination of the key sections in the Family Code. Section 12.02 establishes a rebuttable presumption that the husband is the biological father of a child born to the marriage. TEX.FAM. CODE ANN. § 12.02(a)(1). This presumption cannot be rebutted except by the mother and the presumed father. *Id.* § 12.06(a). Section 11.03(a)(7) prohibits the man claiming to be the true biological father of a child with a presumed father from bringing

a suit affecting the parent-child relationship—which by definition includes a suit to establish or terminate the parent-child relationship. *Id.* § 11.03(a)(7). Working in tandem, these provisions effectively insulate the family from any outsider questioning the legitimacy of its children.

Pointing out that the mother can establish the biological father's paternity, but not vice versa, the majority holds that section 11.03(a)(7) discriminates against the biological father because of his sex. The mother can indeed sue to establish the biological father's parentage, but only after the presumed father's paternity is successfully rebutted. *Id.* § 13.01(a). Whatever discrimination is inherent in the statutory scheme, however, is not against men—it is directed against all those who are not members of the marital family. All outsiders, regardless of their sex, are precluded from questioning the legitimacy of children born to a marital family. Thus, the biological father is discriminated against, if at all, only because he is an outsider.

However, assuming that the discrimination is gender-based, section 11.03(a)(7) still passes muster at the third inquiry: Does the state have an interest so compelling that it can be protected in no other way except by the discriminatory statute? *In Interest of McLean*, 725 S.W.2d at 698. The majority never discusses this pivotal question. That the state has a legitimate compelling interest in promoting and protecting the sanctity of the traditional family and in protecting children born to the family from allegations of illegitimacy by outsiders cannot be seriously questioned. This is the essence of the common-law protection historically accorded the family and children. *Michael H.*, 491 U.S. at 123, 109 S.Ct. at 2342.

How else can the state insulate the family and its children from outside attack except by a blanket prohibition that includes all outsiders? Any exception for a man claiming to be the biological father defeats the compelling interests of the state. That scientific evidence may even conclusively establish the person's claimed parenthood is irrelevant in deciding whether the state's

compelling interests are paramount. *The reality is that, to establish his parentage, the biological father must necessarily establish the illegitimacy of his own child in the process.* Thus, assuming the statutory ban is indeed discriminatory under the first two steps of the test in *In Interest of McLean*, the Equal Rights Amendment still must yield to the state's compelling interests because those interests cannot be served in any manner other than by enforcement of the discriminatory ban. *See In Interest of McLean*, 725 S.W.2d at 698. Accordingly, I would hold that section 11.-03(a)(7) does not violate the Texas Equal Rights Amendment.

Texas has made its public-policy choice. The legitimacy of children and the marital family are preferred over the right of the biological father. I would overrule all points and affirm the judgment.