*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KYRESHA LEFEVER,

        Plaintiff-Appellee,

v

LANESHA MATTHEWS,

        Defendant-Appellant.

FOR PUBLICATION
April 1, 2021

No. 353106
Wayne Circuit Court
LC No. 19-103263-DP

Before: GLEICHER, P.J., and K. F. KELLY and RIORDAN, JJ.

GLEICHER, J. (*concurring*).

Kyresha LeFever and Lanesha Matthews agreed to create and parent a child together. Using artificial reproductive technology, their efforts resulted in the birth of twins. The majority holds that both women are legal mothers of the twins. I fully concur.

As the majority cogently explains, the trial court erred by interpreting the Surrogate Parenting Act (SPA), MCL 722.851 *et seq*., as an impediment to the parental standing of Matthews, who bore the children. No surrogacy contract existed and neither woman agreed to relinquish her parental rights, removing this case from the SPA's ambit. The trial court further erred, the majority points out, by plucking excerpts from other unrelated, inapplicable statutory provisions in an effort to condition a mother's right to parent on a genetic relationship. I write separately to propose an additional analysis, and to address the constitutional questions the majority abjures.

## I. THE COMMON LAW AND THE CHILD CUSTODY ACT

The novel legal issue presented in this custody dispute is whether Matthews, who bore twins while in a committed, nonmarital relationship with Kyresha LeFever, is entitled to be recognized as the children's mother. Based on the fact LeFever supplied the ova that were fertilized by donor sperm and implanted in Matthews' uterus, the trial court determined that only LeFever qualified as the twins' "natural parent." Matthews, the trial court ruled, was a "third party" entitled to none of the rights of parenthood. In rejecting the trial court's reasoning and ruling, the majority centers its analysis on the Child Custody Act (CCA), MCL 722.21 *et seq*., specifically the act's definition of "parent" as "the natural or adoptive parent of a child." MCL

-1-

722.22(i). My colleagues devote considerable effort to unraveling the meaning of "natural parent," consulting four different dictionaries before ultimately concluding that the term "is elastic enough to include" a child's birth mother.[1]

This dictionary-driven search for a suitable definition is unnecessary. A woman who gives birth to a child is that child's natural mother under the common law, and there is no reason to look elsewhere for meaning.

For centuries, "natural mother" has meant a woman who gestates and bears a child; the common law knew no other possibility. "Historically, gestation proved genetic parentage beyond doubt, so it was unnecessary to distinguish between gestational and genetic mothers." Roosevelt, *The Newest Property: Reproductive Technologies and the Concept of Parenthood*, 39 Santa Clara L Rev 79, 97 (1998). This case involves children born to lesbian women who were legally prohibited from marrying at the time of their conception. Under the common law, an unmarried woman who gave birth was always considered the mother and had no need to legally establish her custodial rights. "At the moment of birth, the nonmarital child—unlike the marital child—had one legal parent: the mother. Gestation and birth evidenced the biological fact of maternity and furnished a relationship to the child that justified legal recognition." NeJaime, *The Nature of Parenthood*, 126 Yale LJ 2260, 2267 (2017).[2]

---

[1] The majority also unnecessarily relies on dicta from *Stankevich v Milliron*, unpublished opinion per curiam of the Court of Appeals, issued October 17, 2013 (Docket No. 310710), slip op at 2 (*Stankevich I*), defining a "natural parent" as "a blood relation." *Stankevich I* arose from a custody suit brought by a woman whose wife gave birth to the couple's child. The panel granted summary disposition to the defendant, holding that the plaintiff lacked standing because she was not a "natural parent." Relying on a dictionary, *Stankevich I* held that as used in the phrase "natural parent," "natural" meant " 'related by blood rather than by adoption: one's natural parents.' " *Id*. Our Supreme Court vacated *Stankevich I* based on *Obergefell v Hodges*, 576 US 644; 135 S Ct 2584; 192 L Ed 2d 609 (2015), and remanded for further proceedings. *Stankevich v Milliron*, 498 Mich 877 (2015) (*Stankevich II*). On remand and in recounting the history of the case, this Court "noted" its holding in *Stankevich I* that the plaintiff was not a "natural parent" because she was not "related to the child by blood," but held that because of the parties' marriage, the plaintiff was "not barred from asserting" the "equitable-parent doctrine" described in *Atkinson v Atkinson*, 160 Mich App 601; 408 NW2d 516 (1987). *Stankevich v Milliron (On Remand)*, 313 Mich App 233, 236; 882 NW2d 194 (2015) (*Stankevich III*). The "related by blood" definition advanced in *Stankevich I* was inconsequential to the holding of *Stankevich III* and has no precedential force. The term that requires interpretation in this case is "natural parent," the phrase the Legislature selected, rather than a term identified by an appellate court in a now-vacated opinion.

[2] See also Roberts, *The Genetic Tie*, 62 U Chi L Rev 209, 253 (1995) ("At common law, a woman was the legal mother of the child to whom she gave birth."); D'Alton-Harrison, *Mater Semper Incertus Est: Who's Your Mummy?*, 22 Medical Law Rev 357, 357 (2014) ("In English law, the legal term for father has been given a broad definition but the definition of mother remains rooted

When the CCA was enacted in 1970, the Legislature undoubtedly assumed that a woman who bore a child would automatically qualify as the child's natural mother; it made no provision for an alternate choice, and nothing in the act even remotely contemplates a dispute regarding maternity. Three decades later, when enacting the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.*, the Legislature described various methods through which a man may attain the status of a "natural parent," but again presumed that a woman bearing a child was the child's "natural" mother. See MCL 700.2114. Because the plain and ordinary meaning of the term "natural parent" includes a woman who bears a child, I would hold that Matthews is a "natural parent."[3] Accordingly, I concur with the majority that a genetic connection to one's child is unnecessary to establish maternity.

## II. THE CONSTITUTION

The majority elects against addressing the constitutional arguments made by Matthews and amici.[4] In my view, the constitutional issues presented are weighty and merit consideration, particularly because they may become relevant on remand and in similar cases.

Excluding a *married* birth mother who achieved parenthood through assisted reproductive technology from consideration as a "natural parent" poses serious equal protection problems. Michigan law provides that a husband is the legal parent of a child born to his wife through assisted reproduction technology if he consented to the procedure. MCL 333.2824(6). Analogously, a married woman in a same-sex relationship should have precisely the same right.

Matthews and LeFever could not have legally married in Michigan when the twins were born, and when they separated, same-sex marriage remained illegal. At that time the common law did not authorize or even recognize the concept of two legal fathers. See *Michael H v Gerald D*, 491 US 110, 118; 109 S Ct 2333; 105 L Ed 2d 91 (1989) ("California law, like nature itself, makes no provision for dual fatherhood."). Before *Obergefell*, dual motherhood was also considered legally impossible. See *Johnson v Calvert*, 5 Cal 4th 84, 92; 851 P2d 776 (1993) ("Yet for any child California law recognizes only one natural mother, despite advances in reproductive technology rendering a different outcome biologically possible.").

---

in biology with the Roman law principle *mater semper certa est* (the mother is always certain) remaining the norm.").

[3] The CCA also uses the term "biological parent" in several places; see, e.g., MCL 722.26c(1)(b)(*i*), MCL 722.27a(4), and MCL 722.25(2). "Biological parent" is not defined in the act. In a brief order, our Supreme Court equated the term "biological parent" with "natural parent," but limited its statement to "the circumstances of this case." *Porter v Hill*, 495 Mich 987, 987-988 (2014). Why did the Legislature choose the word "biological" and not "genetic"? The CCA was enacted in 1970, while the sections containing the world "biological" were added later. Having given birth to the twins, Matthews is, indisputably, their "biological parent."

[4] We had the benefit of two helpful amicus curiae briefs; one filed on behalf of a number of professors of family law, and the other by the American Civil Liberties Union of Michigan.

The majority relies on the CCA to conclude that here, both women have parental standing, but takes as a given that an unmarried egg donor such as LeFever is automatically a second "natural parent" under the CCA. The CCA does not identify genetics as a criterion establishing parenthood. Historically, when it came to paternity, genetics were not relevant to the fatherhood of a child born of a marriage; the marital presumption instead controlled.[5] The sperm donor who fertilized the eggs implanted in Matthews' uterus certainly is not a candidate for official fatherhood of the twins. Why should LeFever, whose role was analogous to the sperm donor, have automatic standing under the CCA?

I suggest that this gap in the majority's opinion remains unaddressed because the majority inherently accepts an unarticulated proposition: by donating genetic material, LeFever demonstrated her *intent* to parent, and that combined with the commitment of her ova sufficed to endow her with "natural parent" status.

In *DMT v TMH*, 129 So3d 320, 327 (Fla, 2013), the Florida Supreme Court confronted precisely this issue. There, the mother who gestated and bore the child asserted that her partner, the egg donor, had no fundamental right to parent the child. The Florida Supreme Court held that Florida's assisted reproduction statute was unconstitutional on due process and equal protection grounds, in part because it denied same-sex couples "the statutory protection against the automatic relinquishment of parental rights that it affords to heterosexual unmarried couples seeking to utilize the identical assistance of reproductive technology." *Id.* at 328. The Michigan and Florida statutory schemes are dissimilar. But the larger constitutional holding of Florida's Supreme Court resonates: "The due process guarantees in the Florida and United States Constitutions and the privacy provision of the Florida Constitution do not permit the State to deprive this biological mother of parental rights where she was an intended parent and actually established a parental relationship with the child." *Id*. at 347.

This approach dovetails with the purpose of the CCA: "This act is equitable in nature and shall be liberally construed and applied to establish promptly the rights of the child and the rights and duties of the parents involved." MCL 722.26(1). A "natural parent" paradigm focusing exclusively on genetics would exclude Matthews as a parent, despite that she birthed the children and intended to parent them. Similarly, a "natural parent" paradigm focusing exclusively on gestation and birth would exclude LeFever from establishing her status as a parent, despite that she intended to parent the twins and her egg donation demonstrated her commitment to parenthood. Indisputably, LeFever is also a "natural parent" despite that there was nothing "natural" about the process through which the twins were conceived. In the majority's parlance, the CCA's use of the term "natural parent" is "elastic enough" to include LeFever as well as Matthews.

LeFever and Matthews also have a *constitutional* right to the custody of their children. Our Supreme Court has described the CCA as "a comprehensive statutory scheme" representing "the exclusive means for pursuing" rights to a child's custody, support, and parenting time. *Van v*

---

[5] "Under what became known as 'Lord Mansfield's Rule,' a husband was presumed to be the father of his wife's child and a declaration of the father or mother could not be admitted to bastardize the issue born after marriage." *Aichele v Hodge*, 259 Mich App 146, 157-158; 673 NW2d 452 (2003) (quotation marks and citation omitted).

*Zahorik*, 460 Mich 320, 327-328; 597 NW2d 15 (1999). As the majority points out, the CCA does not specifically address the unique question presented in this case. The United States Constitution fills this gap. Longstanding constitutional principles compel the conclusion that both LeFever and Matthews are legal parents of the twins and are entitled to a full complement of parental rights.

"The essence of the Equal Protection Clauses is that the government not treat persons differently on account of certain, largely innate, characteristics that do not justify disparate treatment." *Crego v Coleman*, 463 Mich 248, 258; 615 NW2d 218 (2000). The Genetic Parentage Act (GPA), MCL 722.1461 *et seq*., permits a man to establish paternity by way of genetic testing, and to then acquire parental rights. The Revocation of Paternity Act (ROPA), MCL 722.1431 *et seq*., grants standing to an unmarried man who claims to be the father of a child to challenge paternity determinations under certain circumstances. No "exceedingly persuasive justification" exists for treating men and women differently. See *Mississippi Univ for Women v Hogan*, 458 US 718, 724; 102 S Ct 3331; 73 L Ed 2d 1090 (1982) ("Our decisions also establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification.").

The GPA, MCL 722.1469(2) provides in relevant part:

> Genetic testing that determines the man is the biological father of a child under this act may be the basis for court-ordered child support, custody, or parenting time without further adjudication under the paternity act. The child who is the subject of the genetic testing has the same relationship to the mother and the man determined to be the biological father under this act as a child born or conceived during a marriage and has identical status, rights, and duties of a child born in lawful wedlock effective from birth.

A genetically proven mother is entitled to the same "status, rights, and duties" as a genetically proven father, despite that she is unmarried to the birth mother. Under the EPIC, when a child is born out of wedlock or is not the "issue" of a marriage, a man is considered a child's "natural father" if he and the child "have established a mutually acknowledged relationship of parent and child that begins before the child becomes age 18 and continues until terminated by the death of either." MCL 700.2114(1)(b)(*iii*). Interpreting this statute as allowing only men to utilize and benefit from alternative methods of establishing "natural parenthood" would violate basic equal protection principles.

Further, LeFever and Matthews had a constitutional right to create the twins in the manner they chose, and it follows that both women have constitutionally protected due process rights to parent the twins despite their nonmarital status. That Matthews lacks a genetic relationship to the twins is constitutionally irrelevant to her liberty interest in their custody. And even had she not personally gestated and born the children (or had an ovum from a donor other than LeFever been implanted in Matthews' womb), I suggest that both women would nonetheless be entitled to be considered parents of the twins.

"[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000). *Troxel* drew on a number of cases expressing the

same sentiment, including *Wisconsin v Yoder*, 406 US 205, 232; 92 S Ct 1526; 32 L Ed 2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Quilloin v Walcott*, 434 U S 246, 255; 98 S Ct 549; 54 L Ed 2d 511 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."). *Troxel*, 530 US at 66.

Had Matthews and LeFever been able to marry at the time the twins were born, likely both would have been named as parents on the birth certificates. This Court has developed an "equitable parent" doctrine designed to permit *married*, nonbiological parents to secure parental rights. In *Atkinson v Atkinson*, 160 Mich App 601, 608-609; 408 NW2d 516 (1987), we held that:

> a husband who is not the biological father of a child born or conceived during the marriage may be considered the natural father of that child where (1) the husband and the child mutually acknowledge a relationship as father and child, or the mother of the child has cooperated in the development of such a relationship over a period of time prior to the filing of the complaint for divorce, (2) the husband desires to have the rights afforded to a parent, and (3) the husband is willing to take on the responsibility of paying child support.

Our Supreme Court has refused to apply the equitable parent doctrine to an unwed nonbiological parent, however, holding that "the extension of substantive rights regarding child custody implicates significant public policy issues and is within the province of the Legislature, not the judiciary." *Van*, 460 Mich at 331.

Here, we confront a biologic tie that makes the case for equitable parenthood stronger. And in the years that have elapsed since *Van*, our Legislature has signaled that neither marriage nor biology are central to parenthood. In addition to allowing unmarried men to establish paternity under the GPA, the Legislature allows an unmarried man to pursue parental rights under the ROPA. The ROPA defines an "alleged father" as "a man who by his actions could have fathered [a] child." MCL 722.1433(c). An "alleged father" may pursue an action to deprive a "presumed father," defined as "a man who is presumed to be the child's father by virtue of his marriage to the child's mother at the time of the child's conception or birth," MCL 722.1433(e), of parental rights. By enacting this statute, the Legislature empowered unmarried men to seek parental rights, signaling that marriage is not a prerequisite to legal parent status and custody of a child.[6]

Indeed, as Justice Marilyn KELLY pointed out in her dissent in *Van*, the CCA says nothing at all about biology, marriage, and never defines the term "parent." *Van*, 460 Mich at 343, 346 (KELLY, J., dissenting). Given that "[o]ne-in-four parents living with a child in the United States today are unmarried," and that more than 24 million children in this county now live with an unmarried parent, conditioning custodial rights on marriage serves no legitimate interests,

---

[6] See also MCL 722.1003(1) ("If a child is born out of wedlock, a man is considered to be the natural father of that child if the man joins with the mother of the child and acknowledges that child as his child by completing a form that is an acknowledgment of parentage.").

particularly those of the involved children.  Livingston, *The Changing Profile of Unmarried Parents*, Pew Research Center, April 25, 2016, available at <https://www.pewresearch.org/social-trends/2018/04/25/the-changing-profile-of-unmarried-parents/> (accessed March 15, 2021).  As Justice KELLY presciently observed, "when child custody or visitation is at issue, the Legislature has decreed that the overriding concern is not the ultimate preservation by the state of the institution of marriage.  It is, instead, the attainment of the best interests of the children."  *Van*, 460 Mich at 346 (KELLY, J., dissenting).

Applying the equitable and due process principles described in a century of Supreme Court jurisprudence regarding parenthood and families, I conclude that unmarried parents in same-sex relationships who do not avail themselves of the sophisticated reproductive technology used by these parties should nevertheless be considered "natural parents" under Michigan law.  Matthews and Lefever were able to afford a technology that provided both of them with a biological connection to their child.  Two men in a committed but unmarried same-sex relationship would not be able to avail themselves of that option, and for some lesbian couples, shared biology may also be impossible.

"[B]iological relationships are not the exclusive determination of the existence of a family. . . .  No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship."  *Smith v Org of Foster Families for Equality & Reform*, 431 US 816, 843-844; 97 S Ct 2094; 53 L Ed 2d 14 (1977).  See also *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972) (declaring that an unmarried father's "interest in retaining custody of his children is cognizable and substantial").  Matthews and LeFever share a liberty interest in the twins created by both biology and an established parental relationship.  I suggest that *Van*'s logic has been undermined the GPA and the ROPA, which open the door to parental rights for unmarried fathers.  Due process and equal protection principles similarly open the door to parental rights for unmarried, same-sex parents to enjoy the rights and obligations of parenthood.


/s/ Elizabeth L. Gleicher